# GRIFFITH *v.* KENTUCKY

No. 85–5221.   Argued October 14, 1986—Decided January 13, 1987*

---

*Together with No. 85–5731, *Brown* v. *United States*, on certiorari to the United States Court of Appeals for the Tenth Circuit.

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, POWELL, STEVENS, and SCALIA, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 328. REHNQUIST, C. J., filed a dissenting opinion, *post*, p. 329. WHITE, J., filed a dissenting opinion, in which REHNQUIST, C. J., and O'CONNOR, J., joined, *post*, p. 329.

*J. Vincent Aprile II* argued the cause for petitioner in No. 85–5221. With him on the brief were *Larry H. Marshall* and *JoAnne M. Yanish*. *Fred Haddad* argued the cause and filed a brief for petitioner in No. 85–5731.

*Paul W. Richwalsky, Jr.*, Assistant Attorney General of Kentucky, argued the cause for respondent in No. 85–5221. With him on the brief were *David L. Armstrong*, Attorney General, and *David K. Martin*, Assistant Attorney General. *Deputy Solicitor General Bryson* argued the cause for the United States. With him on the brief were *Solicitor General Fried, Assistant Attorney General Trott*, and *Roy T. Englert, Jr.*†

---

†*Julius LeVonne Chambers, Charles Stephen Ralston*, and *Steven L. Winter* filed a brief for the NAACP Legal Defense & Educational Fund, Inc., et al. as *amici curiae* urging reversal in both cases.

*Frances Baker Jack* filed a brief for the National Association of Criminal Defense Lawyers, Inc., as *amicus curiae* in both cases.

Briefs of *amici curiae* in No. 85–5221 were filed for the State of North Carolina et al. by *Lacy H. Thornburg*, Attorney General of North Carolina, *Joan H. Byers*, Special Deputy Attorney General, *Charles A. Graddick*, Attorney General of Alabama, *Robert K. Corbin*, Attorney General of Arizona, *John Steven Clark*, Attorney General of Arkansas, *John I. Kelly*, Chief State's Attorney of Connecticut, *Charles M. Oberly*, Attorney

JUSTICE BLACKMUN delivered the opinion of the Court.

These cases, one state and one federal, concern the retrospective application of *Batson* v. *Kentucky*, 476 U. S. 79 (1986).

In *Batson*, 476 U. S., at 96–98, this Court ruled that a defendant in a state criminal trial could establish a prima facie case of racial discrimination violative of the Fourteenth Amendment, based on the prosecution's use of peremptory challenges to strike members of the defendant's race from the jury venire, and that, once the defendant had made the prima facie showing, the burden shifted to the prosecution to come forward with a neutral explanation for those challenges. In the present cases we consider whether that ruling is applicable to litigation pending on direct state or federal review or not yet final when *Batson* was decided. We answer that question in the affirmative.

I

A. *No. 85–5221.* Petitioner Randall Lamont Griffith, a black person, was indicted in 1982 in the Circuit Court of Jefferson County, Ky. (the same court where Batson was tried), on charges of first-degree robbery, theft by unlawful taking,

General of Delaware, *Corinne K. A. Watanabe*, Attorney General of Hawaii, *Neil F. Hartigan*, Attorney General of Illinois, *Linley E. Pearson*, Attorney General of Indiana, *Thomas J. Miller*, Attorney General of Iowa, *Robert T. Stephan*, Attorney General of Kansas, *William J. Guste, Jr.*, Attorney General of Louisiana, *Stephen H. Sachs*, Attorney General of Maryland, *Edwin L. Pittman*, Attorney General of Mississippi, *William L. Webster*, Attorney General of Missouri, *Michael Turpen*, Attorney General of Oklahoma, *Travis Medlock*, Attorney General of South Carolina, *W. J. Michael Cody*, Attorney General of Tennessee, *Jim Mattox*, Attorney General of Texas, *David L. Wilkinson*, Attorney General of Utah, *Mary Sue Terry*, Attorney General of Virginia, and *Archie G. McClintock*, Attorney General of Wyoming; for the Lawyers' Committee for Civil Rights under Law by *Barry Sullivan, Marshall J. Schmitt, Harold R. Tyler, Jr., James Robertson, Norman Redlich, William L. Robinson*, and *Judith A. Winston;* and for the National Legal Aid and Defender Association by *Patricia Unsinn.*

and being a persistent felony offender in the second degree. App. 2. On the first day of trial, the prosecution and defense attorneys conducted *voir dire* examination of the jury venire and exercised their peremptory challenges.[1] The prosecution used four of its five allotted challenges to strike four of the five prospective black jurors. The defense used eight of its allotted nine challenges to strike prospective white jurors. There were two duplicate strikes. The two extra jurors who remained because of the duplicate strikes, one of whom was a black person, then were removed by random draw.[2] Thus, no black person remained on the jury. *Id.*, at 5, 12–13.

Defense counsel expressed concern that Griffith was to be tried by an all-white jury. He asked the court to request the prosecutor to state his reasons for exercising peremptory challenges against the four prospective black jurors. The request was refused. *Id.*, at 13. Counsel then moved for discharge of the panel, alleging that the prosecutor's use of peremptory challenges to remove all but one of the prospective black jurors constituted a violation of Griffith's Sixth and Fourteenth Amendment rights. *Id.*, at 15. The court denied the motion. The jury returned a verdict of guilty on the charge of first-degree robbery and fixed petitioner's punishment at 10 years' imprisonment.[3] The jury then found petitioner guilty of being a persistent felony offender, and, pur-

---

[1] In Kentucky, upon the completion of *voir dire*, the parties simultaneously exercise their respective peremptory challenges. Each side strikes names from the list of jurors who have been qualified and presents the strikes to the court. Ky. Rule Crim. Proc. 9.36(2).

[2] "If the number of prospective jurors remaining on the list [after peremptory challenges] exceeds the number of jurors to be seated, the cards bearing numbers identifying the prospective jurors [are] placed in a box" and the clerk of the court draws at random the number of cards necessary "to reduce the jury to the number required by law." *Ibid.*

[3] Before submitting the case to the jury, the trial court granted Griffith's request for a directed verdict of acquittal on the charge of theft by unlawful taking. See Tr. 204–206.

suant to Ky. Rev. Stat. § 532.080 (1985), enhanced his sentence to 20 years' imprisonment.

The Supreme Court of Kentucky, with an unpublished memorandum opinion, affirmed the judgment of conviction. App. 17. The court rejected petitioner's claim that the prosecutor's use of peremptory challenges deprived him of guaranteed equal protection. It relied on *Swain* v. *Alabama,* 380 U. S. 202 (1965), where this Court ruled that a black defendant did not establish a violation of the Equal Protection Clause solely on proof of the prosecutor's use of peremptory challenges to strike black jurors at the defendant's own trial. *Id.,* at 221–222. The Court noted, however, that an inference of purposeful discrimination could be raised where a prosecutor had engaged in a pattern of challenging black jurors in a series of cases. See *id.,* at 223–224. The Kentucky court concluded that *Swain* disposed of petitioner's claim and it "decline[d] to go further than the *Swain* court." App. 18.

Griffith timely filed here a petition for a writ of certiorari. While his petition was pending, this Court decided *Batson* v. *Kentucky, supra,* where it rejected a portion of the reasoning of *Swain* v. *Alabama* on which the Kentucky court had relied. 476 U. S., at 89–96. Two months later, in *Allen* v. *Hardy,* 478 U. S. 255 (1986) *(per curiam),* we held that the ruling in *Batson* was not to be applied retroactively to a case on federal habeas review. We granted certiorari in Griffith's case, 476 U. S. 1157 (1986), limited to the question whether the ruling in *Batson* applies retroactively to a state conviction pending on direct review at the time of the *Batson* decision.

B. *No. 85–5731.* In 1984, petitioner Willie Davis Brown, a black person, was convicted by a jury in the United States District Court for the Western District of Oklahoma on narcotics charges. During jury selection, two venire panels were assembled. 6 Record 2–10.[4] There were six prospec-

---

[4] The number of prospective jurors in the first venire who were excused for cause resulted in a remaining number insufficient to constitute a full petit jury. 6 Record 9–10.

tive black jurors in the total venire. Four were excused for cause by the court and the other two were excused by the prosecutor's use of peremptory challenges. *Id.*, at 20.[5] Defense counsel objected to the prosecutor's use of peremptory challenges to strike the black persons from the jury, claiming that petitioner was thereby denied a jury representative of the community. *Id.*, at 20–21. No action was taken in response to that objection.

As prospective jurors were being assembled for the second venire panel, the prosecutor called the jury clerk to inquire about the racial composition of the additional venire. At a hearing held later while the jury was deliberating, there was evidence that the prosecutor said to the clerk: "We would like to have as few black jurors as possible." App. 51. The clerk testified, however, that she remembered the prosecutor's comment to be: "Don't get any blacks on this jury." *Id.*, at 38–39. The clerk went on to say that she did not alter the jury selection in any way in response to the prosecutor's comment. *Id.*, at 44–45. The District Court concluded that the prosecutor's contact with the jury clerk "would have to be looked at and dealt with by someone," *id.*, at 44, inasmuch as it fell "into the category of possible prosecutorial misconduct," *id.*, at 46, but that it did not affect the integrity of the selection of the jury. *Id.*, at 45. The court therefore concluded that a new trial would not be necessary if the jury convicted petitioner. *Id.*, at 46.

The United States Court of Appeals for the Tenth Circuit affirmed the judgment of conviction. 770 F. 2d 912 (1985). It rejected Brown's claim that the prosecutor's use of peremptory challenges to exclude prospective black jurors,

---

[5] There is some confusion as to the number of prospective black jurors in the total venire. According to a statement in the record, there were six in the two panels. *Id.*, at 20. At oral argument, counsel for petitioner Brown stated that five had been called. Tr. of Oral Arg. 3. There appears to be agreement, however, that two black jurors were excused by the prosecutor's use of peremptory challenges. See *ibid.*; 6 Record 20; App. 14.

combined with his call to the jury clerk, violated petitioner's right to an impartial jury. The court concluded that Brown had not met *Swain*'s threshold requirement that petitioner must show a systematic and intentional course of conduct by the prosecutor calculated to exclude black jurors in "case after case." 770 F. 2d, at 914. It further concluded that the communication by the prosecutor to the jury clerk did not suggest a pattern of systematic exclusion of black jurors. Although the court observed that the prosecutor's action was "improper" and "must be condemned," *ibid.*, it concluded, as had the District Court, that the prosecutor's request had no effect on the selection of Brown's jury.

Prior to our *Batson* decision, petitioner timely filed with this Court a petition for a writ of certiorari. We granted certiorari, 476 U. S. 1157 (1986), again limited to the question whether the ruling in *Batson* applies retroactively to a federal conviction then pending on direct review. The case was set for argument in tandem with Griffith's case.

## II

Twenty-one years ago, this Court adopted a three-pronged analysis for claims of retroactivity of new constitutional rules of criminal procedure. See *Linkletter* v. *Walker*, 381 U. S. 618 (1965). In *Linkletter*, the Court held that *Mapp* v. *Ohio*, 367 U. S. 643 (1961), which extended the Fourth Amendment exclusionary rule to the States, would not be applied retroactively to a state conviction that had become final before *Mapp* was decided. The Court explained that "the Constitution neither prohibits nor requires retrospective effect" of a new constitutional rule, and that a determination of retroactivity must depend on "weigh[ing] the merits and demerits in each case." 381 U. S., at 629. The Court's decision not to apply *Mapp* retroactively was based on "the purpose of the *Mapp* rule; the reliance placed upon the [previous] doctrine; and the effect on the administration of justice of a retrospective application of *Mapp*." 381 U. S., at 636. See also

*Stovall* v. *Denno*, 388 U. S. 293, 297 (1967) (retroactivity depends on "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards").

Shortly after the decision in *Linkletter*, the Court held that the three-pronged analysis applied both to convictions that were final[6] and to convictions pending on direct review. See *Johnson* v. *New Jersey*, 384 U. S. 719, 732 (1966); *Stovall* v. *Denno*, 388 U. S., at 300. In the latter case, the Court concluded that, for purposes of applying the three factors of the analysis, "no distinction is justified between convictions now final . . . and convictions at various stages of trial and direct review." *Ibid.* Thus, a number of new rules of criminal procedure were held not to apply retroactively either to final cases or to cases pending on direct review. See, *e. g.*, *Stovall* v. *Denno, supra; DeStefano* v. *Woods*, 392 U. S. 631, 635, n. 2 (1968); *Desist* v. *United States*, 394 U. S. 244, 253–254 (1969); *Daniel* v. *Louisiana*, 420 U. S. 31 (1975) *(per curiam)*.

In *United States* v. *Johnson*, 457 U. S. 537 (1982), however, the Court shifted course.[7] In that case, we reviewed at some length the history of the Court's decisions in the area of retroactivity and concluded, in the words of Justice Harlan: "'"[R]etroactivity" must be rethought.'" *Id.*, at 548 (quoting *Desist* v. *United States*, 394 U. S., at 258 (dissenting opinion)). Specifically, we concluded that the retroactiv-

---

[6] By "final," we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied. See *United States* v. *Johnson*, 457 U. S. 537, 542, n. 8 (1982) (citing *Linkletter* v. *Walker*, 381 U. S. 618, 622, n. 5 (1965)).

[7] In *United States* v. *Johnson*, the Court held that the Fourth Amendment ruling announced in *Payton* v. *New York*, 445 U. S. 573 (1980), prohibiting police from making a warrantless, nonconsensual entry into a suspect's home for the purpose of making a routine felony arrest, applied retroactively to a case pending on direct appeal.

ity analysis for convictions that have become final must be different from the analysis for convictions that are not final at the time the new decision is issued.[8] We observed that, in a number of separate opinions since *Linkletter*, various Members of the Court "have asserted that, at a minimum, all defendants whose cases were still pending on direct appeal at the time of the law-changing decision should be entitled to invoke the new rule." 457 U. S., at 545, and n. 9 (collecting opinions).[9] The rationale for distinguishing between cases that have become final and those that have not, and for applying new rules retroactively to cases in the latter category, was explained at length by Justice Harlan in *Desist* v. *United States*, 394 U. S., at 256 (dissenting opinion), and in *Mackey* v. *United States*, 401 U. S. 667, 675 (1971) (opinion concurring in judgment). In *United States* v. *Johnson*, we embraced to a significant extent the comprehensive analysis presented by Justice Harlan in those opinions.

In Justice Harlan's view, and now in ours, failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication. First, it is a settled principle that this Court adjudicates only "cases" and "controversies." See U. S. Const., Art. III, § 2. Unlike a legislature, we do not promulgate new rules of constitutional criminal procedure on a broad basis. Rather, the nature of judicial review requires that we adjudicate specific cases, and each case usually becomes the vehicle for announcement of a new rule. But after we have

---

[8] We noted in *Johnson* that our review did not address the area of civil retroactivity. See 457 U. S., at 563. That area continues to be governed by the standard announced in *Chevron Oil Co.* v. *Huson*, 404 U. S. 97, 106–107 (1971).

[9] See, among others, *Brown* v. *Louisiana*, 447 U. S. 323, 337 (1980) (POWELL, J., with whom STEVENS, J., joined, concurring in judgment); *Harlin* v. *Missouri*, 439 U. S. 459, 460 (1979) (POWELL, J., concurring in judgment); *Hankerson* v. *North Carolina*, 432 U. S. 233, 245 (1977) (MARSHALL, J., concurring in judgment); *id.*, at 246 (POWELL, J., concurring in judgment).

decided a new rule in the case selected, the integrity of judicial review requires that we apply that rule to all similar cases pending on direct review. Justice Harlan observed:

> "If we do not resolve all cases before us on direct review in light of our best understanding of governing constitutional principles, it is difficult to see why we should so adjudicate any case at all. . . . In truth, the Court's assertion of power to disregard current law in adjudicating cases before us that have not already run the full course of appellate review, is quite simply an assertion that our constitutional function is not one of adjudication but in effect of legislation." *Mackey* v. *United States*, 401 U. S., at 679 (opinion concurring in judgment).

As a practical matter, of course, we cannot hear each case pending on direct review and apply the new rule. But we fulfill our judicial responsibility by instructing the lower courts to apply the new rule retroactively to cases not yet final. Thus, it is the nature of judicial review that precludes us from "[s]imply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule." *Ibid.* See *United States* v. *Johnson*, 457 U. S., at 546–547, 555.

Second, selective application of new rules violates the principle of treating similarly situated defendants the same. See *Desist* v. *United States*, 394 U. S., at 258–259 (Harlan, J., dissenting). As we pointed out in *United States* v. *Johnson*, the problem with not applying new rules to cases pending on direct review is "the *actual inequity* that results when the Court chooses which of many similarly situated defendants should be the chance beneficiary" of a new rule. 457 U. S., at 556, n. 16 (emphasis in original). Although the Court had tolerated this inequity for a time by not applying new rules retroactively to cases on direct review, we noted: "The time for toleration has come to an end." *Ibid.*

In *United States* v. *Johnson,* our acceptance of Justice Harlan's views led to the holding that "subject to [certain exceptions], a decision of this Court construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered." *Id.,* at 562. The exceptions to which we referred related to three categories in which we concluded that existing precedent established threshold tests for the retroactivity analysis. In two of these categories, the new rule already was retroactively applied: (1) when a decision of this Court did nothing more than apply settled precedent to different factual situations, see *id.,* at 549, and (2) when the new ruling was that a trial court lacked authority to convict a criminal defendant in the first place. See *id.,* at 550.[10]

The third category—where a new rule is a "clear break" with past precedent—is the one at issue in these cases. We described it in *United States* v. *Johnson,* 457 U. S., at 549–550:

"[W]here the Court has expressly declared a rule of criminal procedure to be 'a clear break with the past,' *Desist* v. *United States,* 394 U. S., at 248, it almost invariably has gone on to find such a newly minted principle nonretroactive. See *United States* v. *Peltier,* 422 U. S. 531, 547, n. 5 (1975) (BRENNAN, J., dissenting) (collecting cases). In this . . . type of case, the traits of the particular constitutional rule have been less critical than the Court's express threshold determination that the '"new" constitutional interpretatio[n] . . . so change[s] the law that prospectivity is arguably the proper course,' *Williams* v. *United States,* 401 U. S., at 659 (plurality opinion). Once the Court has found that the new rule was unanticipated, the second and third *Stovall* factors—reliance by law enforcement authorities

---

[10] These two categories, in which new rules are automatically applied retroactively, are not affected in any way by our decision today.

"on the old standards and effect on the administration of justice of a retroactive application of the new rule—have virtually compelled a finding of nonretroactivity. See, *e. g.*, *Gosa* v. *Mayden*, 413 U. S., at 672–673, 682–685 (plurality opinion); *Michigan* v. *Payne*, 412 U. S., at 55–57."

Thus, we recognized what may be termed a "clear break exception." Under this exception, a new constitutional rule was not applied retroactively, even to cases on direct review, if the new rule explicitly overruled a past precedent of this Court, or disapproved a practice this Court had arguably sanctioned in prior cases, or overturned a longstanding practice that lower courts had uniformly approved. *Id.*, at 551. The Fourth Amendment ruling in *Payton* v. *New York*, 445 U. S. 573 (1980), with which *United States* v. *Johnson* was concerned, was not a clear break in any of these senses, and thus its retroactivity status was not "effectively preordained" by falling within the "clear break" exception. 457 U. S., at 553–554.

In *Shea* v. *Louisiana*, 470 U. S. 51 (1985), we applied *United States* v. *Johnson* and held that the Fifth Amendment rule announced in *Edwards* v. *Arizona*, 451 U. S. 477 (1981), which prohibited the use, after a suspect had requested counsel, of a confession obtained by police-instigated interrogation without the suspect's attorney's being present, was retroactive to cases on direct review when *Edwards* was decided. Using *Johnson*'s rationale, we concluded there was nothing about a Fourth Amendment rule that suggested it should be given greater retroactive effect than a Fifth Amendment rule. 470 U. S., at 59. In addition, as in *United States* v. *Johnson*, we concluded that the new rule did not fall within the "clear break" exception. The previous Term, in *Solem* v. *Stumes*, 465 U. S. 638, 647 (1984), the Court had explicitly recognized that *Edwards* was "not the sort of 'clear break' case that is almost automatically non-

retroactive."[11] Although, in *Shea*, we expressed some doubt as to "the merits of a different retroactivity rule for cases" in which a new rule is a clear break with the past, we explained that "we have no need to be concerned with the question here." 470 U. S., at 59, n. 5.

## III

The question whether a different retroactivity rule should apply when a new rule is a "clear break" with the past, however, is squarely before us in the present cases. In *Allen* v. *Hardy*, 478 U. S. 255 (1986), a case which was here on federal habeas, we said that the rule in *Batson* "is an explicit and substantial break with prior precedent" because it "overruled [a] portion of *Swain*." 478 U. S., at 258.[12] We therefore now reexamine the rationale for maintaining a "clear break" exception to the general proposition that new rules governing criminal procedure should be retroactive to cases pending on direct review. For the same reasons that persuaded us in *United States* v. *Johnson* to adopt different conclusions as to convictions on direct review from those that already had become final, we conclude that an engrafted exception based solely upon the particular characteristics of the new rule adopted by the Court is inappropriate.

First, the principle that this Court does not disregard current law, when it adjudicates a case pending before it on direct review, applies regardless of the specific characteristics of the particular new rule announced. The Court recognized in *United States* v. *Johnson* that the fact that a new rule is a clear break with the past is relevant primarily because it implicates the second and third *Stovall* factors of reliance by law enforcement officials and the burden on the administra-

---

[11] In *Solem* v. *Stumes* the Court concluded that the rule announced in *Edwards* was not retroactive to a conviction that had become final.

[12] Petitioner Griffith argues that the *Batson* ruling was not a "clear break" with the past because it did not announce a new principle of constitutional law under the Equal Protection Clause. Whatever the merits of that argument might be, it is foreclosed by *Allen* v. *Hardy*.

tion of justice imposed by retroactive application. But even if these factors may be useful in deciding whether convictions that already have become final should receive the benefit of a new rule, the "clear break" exception, derived from the *Stovall* factors, reintroduces precisely the type of case-specific analysis that Justice Harlan rejected as inappropriate for cases pending on direct review.

Second, the use of a "clear break" exception creates the same problem of not treating similarly situated defendants the same. James Kirkland Batson, the petitioner in *Batson v. Kentucky*, and Randall Lamont Griffith, the petitioner in the present Kentucky case, were tried in Jefferson Circuit Court approximately three months apart.[13] The same prosecutor exercised peremptory challenges at the trials. It was solely the fortuities of the judicial process that determined the case this Court chose initially to hear on plenary review. JUSTICE POWELL has pointed out that it "hardly comports with the ideal of 'administration of justice with an even hand,'" when "one chance beneficiary—the lucky individual whose case was chosen as the occasion for announcing the new principle—enjoys retroactive application, while others similarly situated have their claims adjudicated under the old doctrine." *Hankerson v. North Carolina*, 432 U. S. 233, 247 (1977) (opinion concurring in judgment), quoting *Desist v. United States*, 394 U. S., at 255 (Douglas, J., dissenting). See also *Michigan v. Payne*, 412 U. S. 47, 60 (1973) (MARSHALL, J., dissenting) ("Different treatment of two cases is justified under our Constitution only when the cases differ in some respect relevant to the different treatment"). The fact that the new rule may constitute a clear break with the past has no bearing on the "actual inequity that results" when only

---

[13] Batson was tried in February 1984. See App. in *Batson v. Kentucky*, O. T. 1985, No. 84–6263, p. 1. Petitioner Griffith was tried in May of that year. App. in No. 85–5221, p. 1. And, for what it may be worth, petitioner Brown was tried in Oklahoma in June 1984. App. in No. 85–5731, p. 2.

one of many similarly situated defendants receives the benefit of the new rule. *United States* v. *Johnson*, 457 U. S., at 556, n. 16 (emphasis omitted).

We therefore hold that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a "clear break" with the past. Accordingly, in No. 85–5221, the judgment of the Supreme Court of Kentucky is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion. In No. 85–5731, the judgment of the United States Court of Appeals for the Tenth Circuit is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, concurring.

I join the Court's opinion, and consider it an important step toward ending the confusion that has resulted from applying *Linkletter* v. *Walker*, 381 U. S. 618 (1965), on a case-by-case basis. I concluded in 1977 that the Court would be well advised to adopt Justice Harlan's view as to the retroactive application of our decisions both with respect to cases pending at the time on direct appeal and with respect to cases pending on habeas corpus petitions. See *Hankerson* v. *North Carolina*, 432 U. S. 233, 246 (1977) (concurring in judgment). The Harlan view is stated in *Mackey* v. *United States*, 401 U. S. 667, 675 (1971) (opinion concurring in judgment in *Mackey* and dissenting from judgment in *Williams* v. *United States*, 401 U. S. 646 (1971)); and *Desist* v. *United States*, 394 U. S. 244, 256 (1969) (dissenting opinion). I was persuaded by Justice Harlan's reasoning then, and have followed it since. See *Hankerson* v. *North Carolina*, *supra; Harlin* v. *Missouri*, 439 U. S. 459, 460 (1979) (concurring in judgment); *Brown* v. *Louisiana*, 447 U. S. 323, 337 (1980) (con-

curring in judgment); *Solem* v. *Stumes*, 465 U. S. 638, 651 (1984) (concurring in judgment).

As the cases we decide today involve only the retroactivity of decisions pending on direct review, it was not necessary for the Court to express an opinion with respect to habeas corpus petitions. As I read the Court's opinion, this question is carefully left open until it is squarely presented. It is to be hoped that the Court then will adopt the Harlan view of retroactivity in cases seeking relief on habeas petitions. See *Mackey* v. *United States*, *supra*, at 681–695. Under that view, habeas petitions generally should be judged according to the constitutional standards existing at the time of conviction.

CHIEF JUSTICE REHNQUIST, dissenting.

As I stated in my dissenting opinion in *Shea* v. *Louisiana*, 470 U. S. 51, 61 (1985), I am willing to adopt both aspects of the approach to retroactivity propounded by Justice Harlan in his opinion in *Mackey* v. *United States*, 401 U. S. 667, 675 (1971). In Justice Harlan's view, new constitutional rules governing criminal prosecutions should apply retroactively for cases pending on direct appeal when the rule is announced, and, with narrow exceptions, should not apply in collateral proceedings challenging convictions that become final before the rule is announced. The majority today adopts only a portion of this approach. I therefore join JUSTICE WHITE's dissent, agreeing with him that, under the present state of our retroactivity jurisprudence, the majority erred in rejecting the reasons cited in *Allen* v. *Hardy*, 478 U. S. 255 (1986), for making *Batson* v. *Kentucky*, 476 U. S. 79 (1986), nonretroactive.

JUSTICE WHITE, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, dissenting.

Last Term this Court decided that the rule announced in *Batson* v. *Kentucky*, 476 U. S. 79 (1986), should not apply on collateral review of convictions that became final before the decision in *Batson* was announced. *Allen* v. *Hardy*, 478

U. S. 255 (1986). In reaching this judgment, the Court weighed the three factors that it has traditionally considered in deciding the retroactivity of a new rule of criminal procedure: "'"(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."'" *Id.*, at 258 (quoting *Solem* v. *Stumes*, 465 U. S. 638, 643 (1984), in turn quoting *Stovall* v. *Denno*, 388 U. S. 293, 297 (1967)). No Justice suggested that this test is unworkable. The question, then, is why the Court feels constrained to fashion a different rule for cases on direct review. The reasons the Court offers are not new, and I find them as unpersuasive today as I have in the past:

> "Two concerns purportedly underlie the majority's decision. The first is that retroactivity is somehow an essential attribute of judicial decisionmaking, and that when the Court announces a new rule and declines to give it retroactive effect, it has abandoned the judicial role and assumed the function of a legislature—or, to use the term Justice Harlan employed in describing the problem, a 'super-legislature.' *Desist* v. *United States*, 394 U. S. 244, 259 (1969) (Harlan, J., dissenting). The second (and not completely unrelated) concern is fairness. It is the business of a court, the majority reasons, to treat like cases alike; accordingly, it is unfair for one litigant to receive the benefit of a new decision when another, identically situated, is denied the same benefit. The majority's concerns are no doubt laudable, but I cannot escape the conclusion that the rule they have spawned makes no sense.

> "As a means of avoiding what has come to be known as the super-legislature problem, the rule announced by the majority is wholly inadequate. True, the Court is not and cannot be a legislature, super or otherwise. But I should think that concerns about the supposed usurpa-

tion of legislative authority by this Court generally go more to the substance of the Court's decisions than to whether or not they are retroactive. Surely those who believe that the Court has overstepped the bounds of its legitimate authority in announcing a new rule of constitutional law will find little solace in a decision holding the new rule retroactive. If a decision is in some sense illegitimate, making it retroactive is a useless gesture that will fool no one. If, on the other hand, the decision is a salutary one, but one whose purposes are ill-served by retroactive application, retroactivity may be worse than useless, imposing costs on the criminal justice system that will likely be uncompensated for by any perceptible gains in 'judicial legitimacy.'

.  .  .  .  .

"The claim that the majority's rule serves the interest of fairness is equally hollow. Although the majority finds it intolerable to apply a new rule to one case on direct appeal but not to another, it is perfectly willing to tolerate disparate treatment of defendants seeking direct review of their convictions and prisoners attacking their convictions in collateral proceedings. As I have stated before, see [*United States* v.] *Johnson*, [457 U. S. 537, 566–568 (1982)] (WHITE, J., dissenting); *Williams* v. *United States*, 401 U. S. 646, 656–659 (1971) (plurality opinion), it seems to me that the attempt to distinguish between direct and collateral challenges for purposes of retroactivity is misguided. Under the majority's rule, otherwise identically situated defendants may be subject to different constitutional rules, depending on just how long ago now-unconstitutional conduct occurred and how quickly cases proceed through the criminal justice system. The disparity is no different in kind from that which occurs when the benefit of a new constitutional rule is retroactively afforded to the defendant in whose case it is announced but to no others; the Court's new

approach equalizes nothing except the numbers of defendants within the disparately treated classes." *Shea* v. *Louisiana*, 470 U. S. 51, 62–64 (1985) (WHITE, J., dissenting).[1]

The Court's invocation of fairness also overlooks the fact that it is a fortuity that we overruled *Swain* v. *Alabama*, 380 U. S. 202 (1965), in a case that came to us on direct review. We could as easily have granted certiorari and decided the matter in a case on collateral review, such as *Allen* v. *Hardy*. In that case, the principle of treating like cases alike would dictate that all cases on collateral review receive the benefit of the new rule. I trust that the Court would not go that far in letting the tail wag the dog; good judgment would—I hope—win out over blind adherence to the principle of treating like cases alike. Yet today the Court acts as if

---

[1] The Court does not in these cases address the differential treatment of cases on direct and collateral review. I adhere to my view that the Court's decisions in *United States* v. *Johnson*, 457 U. S. 537 (1982), and *Shea* v. *Louisiana*, 470 U. S. 51 (1985), provide no satisfactory justification for distinguishing between the two classes of cases. As I stated in *Shea:*

"The majority recognizes that the distinction between direct review and habeas is problematic, but justifies its differential treatment by appealing to the need to draw 'the curtain of finality,' [470 U. S.,] at 60, on those who were unfortunate enough to have exhausted their last direct appeal at the time *Edwards* [v. *Arizona*, 451 U. S. 477 (1981),] was decided. Yet the majority offers no reasons for its conclusion that finality should be the decisive factor. When a conviction is overturned on direct appeal on the basis of an *Edwards* violation, the remedy offered the defendant is a new trial at which any inculpatory statements obtained in violation of *Edwards* will be excluded. It is not clear to me why the majority finds such a burdensome remedy more acceptable when it is imposed on the State on direct review than when it is the result of a collateral attack. The disruption attendant upon the remedy does not vary depending on whether it is imposed on direct review or habeas; accordingly, if the remedy must be granted to defendants on direct appeal, there is no strong reason to deny it to prisoners attacking their convictions collaterally. Conversely, if it serves no worthwhile purpose to grant the remedy to a defendant whose conviction was final before *Edwards*, it is hard to see why the remedy should be available on direct review." *Id.*, at 64–65 (footnote omitted).

it has no choice but to follow a mechanical notion of fairness without pausing to consider "sound principles of decision-making," *Stovall* v. *Denno*, 388 U. S., at 301.

For the foregoing reasons, I would adhere to the approach set out in *Stovall* v. *Denno, supra*, at 300, and recognize no distinction for retroactivity purposes between cases on direct and collateral review. But even if I saw some merit in applying the Harlan approach to cases on direct appeal, I would nonetheless preserve the exception for "clear breaks" recognized in *United States* v. *Johnson*, 457 U. S. 537 (1982). Under our precedent, "a decision announcing a new standard 'is almost automatically nonretroactive' where the decision 'has explicitly overruled past precedent.'" *Allen* v. *Hardy*, 478 U. S., at 258 (quoting *Solem* v. *Stumes*, 465 U. S., at 646, 647). As the majority in *Johnson* explained:

"Once the Court has found that [a] new rule was unanticipated, the second and third *Stovall* factors—reliance by law enforcement authorities on the old standards and effect on the administration of justice of a retroactive application of the new rule—have virtually compelled a finding of non-retroactivity." 457 U. S., at 549–550 (citations omitted).

The Court has already recognized that *Batson* constitutes "an explicit and substantial break with prior precedent," and that "prosecutors, trial judges, and appellate courts throughout our state and federal systems justifiably have relied on the standard of *Swain*." *Allen* v. *Hardy, supra*, at 258, 260. The reasons that the Court gave in *Allen* v. *Hardy* for concluding that "retroactive application of the *Batson* rule on collateral review of final convictions would seriously disrupt the administration of justice," 478 U. S., at 260, apply equally to retroactive application of the *Batson* rule on direct review.[2]

---

[2] "The distinction between direct review and collateral attack may bear some relationship to the recency of the crime; thus, to the extent that the difficulties presented by a new trial may be more severe when the underlying offense is more remote in time, it may be that new trials would tend

The majority knows that it is penalizing justifiable reliance on *Swain,* and in doing so causing substantial disruption in the administration of justice; yet the majority acts as if it has no principled alternative. This is not true; it would be a far sounder rule, and no less principled, to apply the *Stovall* test to determine retroactivity on both direct and collateral review. I respectfully dissent.

---

to be somewhat more burdensome in habeas cases than in cases involving reversals on direct appeal. However, this relationship is by no means direct, for the speed with which cases progress through the criminal justice system may vary widely. Thus, if the Court is truly concerned with treating like cases alike, it could accomplish its purpose far more precisely by applying new constitutional rules only to conduct of appropriately recent vintage. I assume, however, that no one would argue for an explicit '5-year-rule,' for example.

.           .           .           .           .

"Of course, it will be less burdensome in the aggregate to apply *[Batson]* only to cases pending when *[Batson]* was decided than to give it full retroactive effect; by the same token, it would be less burdensome to apply *[Batson]* retroactively to all cases involving defendants whose last names begin with the letter 'S' than to make the decision fully retroactive. The majority obviously would not countenance the latter course, but its failure to identify any truly relevant distinction between cases on direct appeal and cases raising collateral challenges makes the rule it announces equally indefensible." *Shea* v. *Louisiana,* 470 U. S., at 64, n. 1 (WHITE, J., dissenting).