**UNITED STATES of America**

v.

**Arshad Z. PERVEZ Appellant.**

**No. 88–1109.**

United States Court of Appeals,
Third Circuit.

Argued Oct. 19, 1988.

Decided March 6, 1989.

Order on Denial of Rehearing
April 10, 1989.

Stanley Weinberg (argued), Philadelphia, Pa., for appellant.

Amy L. Kurland (argued), Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before BECKER, HUTCHINSON and SCIRICA, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

Defendant Arshad Pervez appeals his conviction on charges of conspiring to defraud the government in violation of 18 U.S.C. § 371, attempting to export beryllium in violation of 50 U.S.C.App. § 2410, and submitting false statements to the Department of Commerce in violation of 18 U.S.C. § 1001. The principal issue raised by this appeal is whether defendant is entitled to a new trial in light of *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). We will vacate and remand to the district court for a new trial on the counts charging Pervez with conspiracy and attempting to export beryllium illegally. We will remand to the district court for a limited hearing to allow Pervez to proffer evidence of entrapment on the false documentation counts, *United States v. Bay*, 852 F.2d 702 (1988). We will affirm the district court on the remaining issues raised on appeal.

I.

Arshad Pervez, a native of Pakistan, moved to Canada in 1967. In 1986, Pervez incorporated his own import-export business, A.P. Enterprises, in Toronto. Pervez contracted with companies in Saudi Arabia and Pakistan to export pillows, food, mini-TVs, satellite antennas, computers, and lumber.

In October 1986, Pervez contacted a business acquaintance in an effort to locate a source of "maraging steel." He was referred to and eventually spoke with Mr. Del Guidice and Mr. Tomley at Carpenter Technology Corporation ("Carpenter"), a Pennsylvania company that manufactures specialty steel for use in high technology products and in the oil industry. In particular, Carpenter manufactures "maraging 350 steel," a steel with a high tensile strength, a limited market, and a very high cost.

Maraging 350 steel is used in the nuclear industry in gas centrifuge enrichment plants. Because maraging steel has nuclear application, its export is governed by the Export Administration Act and its regulations, 15 C.F.R. § 368–99 (1988), which require a U.S. Department of Commerce export license for intended use in an unsafeguarded nuclear facility.[1]

---

1. Pakistan is a non-signatory nation of the Nu-   clear Non–Proliferation Treaty and, according

Because of restrictions placed on the export of maraging steel, Tomley notified the Nuclear Regulatory Commission and met with United States Customs Service personnel, informing them that A.P. Enterprises was interested in purchasing maraging steel for export to Pakistan and that Pervez had alleged that the steel was to be "remelted." [2] At the direction of the United States Customs Service, Tomley forwarded a price quotation to Pervez. Pervez then arranged to meet with Carpenter representatives to discuss the sale. In November 1986, Tomley and U.S. Special Customs Agent John New, acting undercover as an international marketing analyst for Carpenter, met with Pervez in Toronto. At this meeting, Pervez identified his client as Mr. Inam Ul–Haq of Multinational Corporation of Lahore, Pakistan. Tomley told Pervez that Carpenter previously had been directed by the United States Department of Commerce not to manufacture maraging steel for use in Pakistan because it was believed that the material was destined for Pakistan's unsafe nuclear facility. Tomley also told Pervez that Carpenter would not manufacture the steel unless Pervez obtained the proper license from the U.S. Department of Commerce.

During the course of negotiations with New, Pervez offered a variety of contradictory uses for maraging steel. At different times, Pervez stated that the end use would be the Pakistani equivalent of NASA, a research project sponsored by Karachi University's engineering program, the manufacture of rocket motors, the manufacture of high speed compressors and turbines, and the development of anti-tank weapons systems.

In a telephone conversation in December 1986, Pervez and New discussed the Export Administration's licensing requirements. New told Pervez that the Department of Commerce would not issue a license unless Pervez obtained a letter from Multinational stating the intended end use of the maraging steel. New informed Pervez that it might be necessary to make a cash payment to the Department of Commerce licensing officer to ensure the issuance of the license. Pervez said that he would be willing to pay $5000 to obtain the export license, but later asked if he could reduce the "kickback" to $3000.

New then requested Special Agent Frank Rovello of the U.S. Customs Service to meet with Pervez in Philadelphia. In this investigation, Rovello assumed an undercover role as a Department of Commerce Licenses officer. During their meeting on January 13, 1987, Pervez asked Rovello how to get a license to export maraging steel and what information to put on the application. App. at 1412a. Pervez told Rovello that he would present backup letters in support of the application. Rovello informed Pervez that the Department of Commerce needed a "letter from the purchaser saying exactly where they're located ... what they're going to use [the maraging steel] for, where they're [sic] plant is and where can someone from Commerce in Washington or the Embassy in Pakistan do an on site inspection ... that's what they'll probably require." App. at 1411a. When Rovello asked Pervez whether his purchasers would "allow somebody to see the process," Pervez responded, "I don't know about that." App. at 1413a. Pervez then gave Rovello $1000 as a downpayment to secure the export license. App. at 593a–94a.

The next day, Pervez toured the Carpenter plant in Reading, Pennsylvania. After the tour, Tomley, New and Pervez had dinner together, during which Tomley questioned Pervez on the end use of the maraging steel. Tomley told Pervez that he "had no intention of putting his company in jeopardy," and that he believed that Pervez had misrepresented the end use of the maraging steel in Pakistan. App. at 411a. Tomley then told Pervez that he thought the end use was the uranium en-

to a letter sent to Carpenter by the Department of Commerce, would probably be denied an application for an export license for maraging steel by the Department of Commerce. App. at 45a, 695a–96a.

2. In Tomley's opinion, no facilities existed in Pakistan that could remelt maraging steel. App. at 267a.

richment plant in Pakistan. According to New, Pervez nodded his head in the affirmative in response to Tomley's remark. App. at 411a.

About one month later, Pervez mailed Tomley two end use statements which declared that the maraging steel would be used to manufacture high speed turbines and compressors. One end use statement purported to be from Noeem Pasha, General Manager of Multinational, and the other from the Pakistan Council of Scientific and Industrial Research.

For the purpose of its investigation, on March 31, 1987, the Department of Commerce issued a false "license" to Pervez to export the steel. Shortly thereafter, New met with Pervez in Toronto to review export documents and finalize the terms of the sale. At the meeting, Pervez told New for the first time that his buyer also wanted beryllium, a highly controlled specialty metal that also requires a validated export license from the Department of Commerce. When told that export of beryllium was also restricted, Pervez suggested that Rovello be contacted again. App. at 1639a. New and Pervez then discussed alternative methods to export the beryllium from the United States, including diverting it through other countries, identifying the shipment as something other than beryllium, or shipping it directly. When New expressed concern that shipping beryllium was illegal, Pervez remarked that "the United States won't mind a small piece." App. at 1649a. Pervez also stated that his customers in Pakistan were looking for other hard metals. New replied that he thought the other hard metals would be used in "another application in the plant at Kahuta," to which Pervez responded, "Could be." App. at 1651a. At the end of their meeting, Pervez told New that "the Kahuta client is ready." App. at 1674a.

On June 18, 1987, Pervez told New the dimensions and chemical formula of the beryllium over the telephone. App. at 1696a–98a. New again told Pervez that beryllium was a restricted material requiring an export license, and that it had a nuclear application. When Pervez inquired whether it could be shipped under another label, New stated, "You tell me what you want me to put on the box." App. at 1701a. Pervez then said that he wanted New to commingle the beryllium with the maraging steel for shipment to Pakistan. App. at 1701a–02a. During the same conversation, Pervez also inquired whether New could procure a "gamma scanning unit" for use in an "oil refinery." App. at 1705a. New recommended that Pervez inquire elsewhere for such a unit. Finally, in July 1987, Pervez drove to Philadelphia to facilitate the first shipment of maraging steel and to make another payment to Rovello. At that time, he was arrested.

On July 28, 1987, a federal grand jury returned an eight count indictment against Pervez and his co-defendant in Pakistan, Inam Ul–Haq.[3] Pervez was charged with conspiracy to defraud the government (18 U.S.C. § 371), bribery (18 U.S.C. § 201), interstate travel in aid of racketeering (18 U.S.C. § 1952), submitting false statements to the Department of Commerce (18 U.S.C. § 1001), and violating the Export Administration Act through the payment of a bribe for the export of maraging 350 steel and through the attempt to export beryllium (50 U.S.C.App. § 2410). Pervez was convicted of conspiring to defraud the United States (Count One), and of submitting statements to the Department of Commerce that misrepresented the end use for the maraging steel (Counts Six, Seven, and Eight). He admitted the elements of the charges in Count Five (attempting to export beryllium), claiming entrapment, and was found guilty of the offense. He also admitted the elements of the bribery counts, claiming entrapment, and was found not guilty (Counts Two and Four— bribery of a United States Customs agent, and Count Three—interstate travel to bribe a federal employee). Pervez was sentenced to five years imprisonment on Count One, the conspiracy. On Counts Five, Six, Seven and Eight, the imposition of sentence was suspended and he was placed on probation for a period of five years on each

---

3. Inam Ul–Haq remains a fugitive.

count, to run concurrently. App. at 26a. This appeal by Pervez followed.

## II.

■ While Pervez's case was pending on appeal, the Supreme Court decided *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), which held that "even if the defendant denies one or more of the elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Id.* 108 S.Ct. at 886. Before *Mathews* and at the time Pervez was tried, the prevailing law in this circuit required the defendant to admit all the elements of an offense before he was entitled to a jury charge on entrapment. *See, e.g., United States v. Hill*, 655 F.2d 512, 514 (3d Cir. 1981). Because this case is before us on direct appeal, we must apply *Mathews*. *United States v. Berkery*, 865 F.2d 587, 588 (3d Cir.1989) (citing *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) (new rule for conduct of criminal prosecutions to be applied to cases pending on appeal and not yet final)).

In *Mathews*, the Court reiterated the elements of a valid entrapment defense, which must include "government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in criminal conduct." 108 S.Ct. at 886. *See also United States v. El–Gawli*, 837 F.2d 142, 147 (3d Cir.1988) (entrapment occurs when defendant who is not disposed to do so commits a crime as a result of the government's inducement). "[T]o make an entrapment defense a defendant must come forward with some evidence as to both inducement and non-predisposition." *El–Gawli*, 837 F.2d at 145. Moreover, the question of entrapment should be resolved by the jury, and not by the court. *Mathews*, 108 S.Ct. at 886. Nevertheless, we may find that a defendant was entrapped as a matter of law "[w]here the evidence is undisputed that the defendant had no pre-

disposition to commit the crimes with which he is charged, and was induced to do so only by trickery, persuasion, or fraud by the government." *United States v. Gambino*, 788 F.2d 938, 944 (3d Cir.), *cert. denied*, 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986).

In this case, Pervez contends that he is entitled to a judgment of acquittal because he was entrapped as a matter of law on all counts for which he was convicted. In the alternative, he argues that he is entitled to a new trial under the change in law set forth in *Mathews*.

Our review of whether Pervez was entrapped as a matter of law requires inquiry into the legal sufficiency of the evidence, and thus our standard of review is plenary. *United States v. Rodriguez*, 858 F.2d 809, 812 (1st Cir.1988). Whether the change in law under *Mathews*, which we must apply to this direct appeal, requires vacatur of Pervez's convictions and a new trial is also a legal question subject to our plenary review. In this case, the change in law affected Pervez's substantial right to plead inconsistent defenses.

■ Initially, we note that Pervez failed to ask the court for an entrapment instruction despite his denying the elements of the crime. Generally, we will not entertain arguments on appeal that have not been based on objections timely raised below. *United States v. Gibbs*, 739 F.2d 838, 850 (3d Cir.1984) (in banc), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985); Fed.R.Crim.P. 30. In *United States v. Berkery*, however, we reviewed a similar allegation of error under *Mathews* under the "plain error" doctrine of Fed.R. Crim.P. 52(b), which allows us to review "plain errors or defects affecting substantial rights ... although they were not brought to the attention of the court." *Berkery*, 865 F.2d at 588. Thus, we will review the effect of *Mathews* on this case under the plain error doctrine,[4] *United*

---

4. We believe the proper analysis is under the plain error standard. In *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Supreme Court held that the prosecutor's

statements did not undermine the fundamental fairness of the trial and contribute to a miscarriage of justice and thus were not plain error under Fed.R.Crim.P. 52(b). The Court noted:

*States v. Gray*, 468 F.2d 257, 261 (3d Cir. 1972), because the change in the law affects the defendant's substantial right to plead inconsistent defenses. *See also United States v. Zauber*, 857 F.2d 137, 142 (3d Cir.1988) (plain error standard applied to review case involving change in statutory construction rendered by Supreme Court decision), *petition for cert. filed*, 57 U.S.L.W. 3455 (U.S. Jan. 10, 1989) (No. 88–1027); *United States v. Piccolo*, 835 F.2d 517, 519 (3d Cir.1987) (defendant alleged that Supreme Court opinion decided while his case was pending on appeal invalidated his mail fraud conviction; because there was no timely objection to jury instructions, review on appeal limited to whether instructions contained plain errors or defects affecting substantial rights), *cert. denied*, —— U.S. ——, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). *But cf. United States v. Ochs*, 842 F.2d 515, 520–21 (1st Cir.1988) (declining to adopt either plain or harmless error standard).

> A *per se* approach to plain-error review is flawed. An error, of course, must be more than obvious or readily apparent in order to trigger appellate review under Federal Rule of Criminal Procedure 52(b). Following decisions such as *United States v. Frady*, [456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)], *United States v. Socony–Vacuum Oil Co.*, [310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1950)], and *United States v. Atkinson*, [297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555 (1936)], federal courts have consistently interpreted plain-error doctrine as requiring an appellate court to find that the claimed error not only seriously affected "substantial rights," but that it had an unfair prejudicial impact on the jury's deliberations. Only then would the court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice. To do otherwise could well lead to having appellate courts indulge in the pointless exercise of reviewing "harmless plain errors"—a practice that is contrary to the draftsmen's intention behind Rule 52(b), and one that courts have studiously avoided and commentators have properly criticized,....
>
> *Id.* 470 U.S. at 16–17 n. 14, 105 S.Ct. at 1046–47 n. 14 (some citations omitted). See also, *U.S. v. Thame*, 846 F.2d 200, 207 (3rd Cir.), cert. den., —— U.S. ——, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988).

**5.** The trial court charged the jury in part:

## III.

### A. Count One

In Count One of the indictment, Pervez was charged with conspiring to defraud the United States by impairing, obstructing and defeating the lawful functions of the Department of Commerce in its implementation of the export laws of the United States. The objectives of the conspiracy were: attempting to evade the Department of Commerce licensing requirements, bribing a licensing officer of the Department of Commerce, and submitting documents to the Department of Commerce that falsely stated the end use for the maraging steel in Pakistan. App. at 13a. The objectives of the conspiracy described in the indictment focused on the exportation of maraging steel and the bribery of government officials. Nevertheless, the twenty-nine overt acts listed by the government in furtherance of the conspiracy, which were incorporated in the jury charge on conspiracy,[5] included the overt acts undertaken by

> There are 29 overt acts alleged here. I will read them all, as I must, because they happen to be germane to the conspiracy counts, Count [sic].
>
> \* \* \* \* \* \*
>
> On or about June 9, 1987, Pervez stated that he wanted to obtain beryllium and suggested numerous illegal means by which to divert beryllium to Pakistan.
>
> \* \* \* \* \* \*
>
> Twenty-six. On or about June 18, 1987, Pervez contacted an undercover agent and provided the dimensions and chemical formula for the beryllium that he had requested.
>
> On or about June 18, 1987, Pervez requested that beryllium be commingled with the Moraging [sic] steel for export to Pakistan without a license.
>
> On or about July 10, 1987, Pervez traveled to Philadelphia and stated that he wanted one bar of beryllium as a sample and would have follow-up orders.
>
> On or about July 10, 1987, it is alleged that Pervez and Ul–Haq caused a 20 foot shipping container to be delivered to Carpenter for the purpose of moving the Moraging [sic] 350 steel and the beryllium.
>
> The Government must show that the persons alleged to have been members of the conspiracy, had as their objective, the illegal act alleged in the indictment, or the illegal scheme or activity alleged in the indictment and that they formed the conspiracy with specific intent to accomplish that objective and did at least one of

Pervez to export beryllium in violation of the export laws. Furthermore, in his jury charge, the trial judge included the misrepresentation of the end use of beryllium, as well as maraging steel, as an objective of the conspiracy. The jury returned a guilty verdict on Count One.[6]

■ Pervez asserts that he is entitled to an acquittal as a matter of law on Count One, or, in the alternative, to a new trial. We will not order Pervez's acquittal of the conspiracy charge as a matter of law because we do not find it "undisputed that the defendant had no predisposition to commit the crime[ ] ... and was induced to do so only by trickery, persuasion, or fraud by the government." *Gambino*, 788 F.2d at 944. Indeed, there is no evidence that government agents induced Pervez to conspire with them to defraud the United States government. To the contrary, there is abundant evidence that Pervez actively pursued his business association with Carpenter and government agents in order to consummate the sale of maraging steel to his co-defendant in Pakistan and also to reap a healthy commission. App. at 1687a.

Nevertheless, to claim entrapment on Count Five under the pre-*Mathews* standard, Pervez admitted that he attempted to export beryllium in violation of the export laws. Under *Griffith v. Kentucky*, 107 S.Ct. at 716, we must apply *Mathews* to this case pending on direct appeal. *Mathews* affords a defendant the substantial right to plead inconsistent defenses. As we have observed, under Rule 52(b) we may review plain errors affecting substantial rights that were not brought to the attention of the trial court if the error complained of served to "undermine the fundamental fairness of the trial and contribute to the miscarriage of justice." *United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985).

■ We have noted that Pervez's actions involving the export of beryllium, which he admitted in order to claim entrapment to Count Five, were listed as overt acts undertaken in furtherance of the conspiracy and were cited by the trial judge in his jury charge on Count One. Because of Pervez's admission of the substantive beryllium charge, we cannot say that the jury's deliberations on the conspiracy may not have been "tainted" by that admission. *Cf. Berkery*, 865 F.2d 591. Consequently, the fact that Pervez was precluded from pleading inconsistent defenses, which resulted in his admission of the beryllium charge to claim entrapment, undermined the fundamental fairness of the trial. Therefore, we will vacate his conviction on Count One, and remand for a new trial.

### B. Count Five

In Count Five, Pervez was charged with attempting to export beryllium in violation of the export laws. At trial, Pervez admitted committing the crime charged in Count Five, but asserted that he was entrapped. Pervez received an entrapment charge but was found guilty.

■ Despite Pervez's claim, we do not find that he was entrapped as a matter of law. As we have observed, to do so we must find that "the evidence is undisputed that the defendant had no predisposition to commit the crimes with which he is charged, and was induced to do so only by trickery, persuasion, or fraud of the government." *Gambino*, 788 F.2d at 944. The evidence is not undisputed that government agents induced Pervez to attempt to export the beryllium by trickery or persuasion. Pervez, not government agents, initiated discussion of exporting beryllium to Pakistan. In fact, on a number of occasions, New expressed his apprehension to Pervez over shipping beryllium, emphasiz-

---

the overt acts charged in the indictment in furtherance of the conspiracy.
Trial transcript at 8.85–8.89.

**6.** The trial court's instruction on conspiracy included the following: "Among the overt acts are the acts of bribery, as well as the attempt to export beryllium. The Defendant admits doing those things, but contends that he did those things by reason of entrapment and therefore is not guilty of doing an overt act in those respects." Trial Transcript at 8.73–8.74.

ing the illegality of the suggested transaction. App. at 1646a, 1649a.

■ Although Pervez is not entitled to an acquittal as a matter of law, we conclude that, under *Mathews,* he is entitled to a new trial on Count Five. Pervez has claimed that his admission of the elements of the offense charged in Count Five in order to claim entrapment renders his conviction invalid. Like Count One, we find that our review of Pervez's conviction on Count Five in light of *Mathews,* requires us to vacate his conviction because the court's ruling and jury instructions "contained plain errors or defects affecting substantial rights." *Piccolo,* 835 F.2d at 519 (citing Fed.R.Crim.P. 30, 52(b)). The trial court's ruling on entrapment, viewed in light of *Mathews,* precluded Pervez from exercising his substantial right to claim inconsistent defenses, and thus undermined the fundamental fairness of his trial.[7] Indeed, we may surmise that had the prevailing law permitted him to claim entrapment without admitting the charge, he would have done so.[8] For these reasons, we will remand for a new trial on Count Five.

## C. Counts Six, Seven and Eight

Pervez contends that, under *Mathews,* he is entitled to a new trial to allow a jury to consider his evidence of entrapment on the false documentation charges. Pervez did not request a jury instruction on entrapment for Counts Six, Seven and Eight because he had not admitted the elements of those offenses under the pre-*Mathews* rule. Under *Mathews,* we would grant Pervez a new trial on these counts if he had been entitled to a jury charge on entrapment because he had presented "sufficient evidence [at trial] from which a reasonable jury could find entrapment." *Mathews,* 108 S.Ct. at 886.

■ We find that the evidence presented by Pervez at trial would not have justified a jury charge on entrapment on these counts, all of which involve the illegal attempt to export maraging steel through the falsification of an export application. In particular, there was no evidence that Pervez was induced to submit false documents to the Department of Commerce. Indeed, the record is devoid of evidence that shows even that the government initiated or solicited Pervez to submit false documents to the Department of Commerce. *Cf. El-Gawli,* 837 F.2d at 149 ("[a] solicitation, request or approach by law enforcement officials to engage in criminal activity, standing alone, is not an inducement."). Although government agents stated that an export license could be issued only if the steel was intended for a non-nuclear end use, they never suggested that Pervez submit false end use statements. Indeed, it was Pervez's customer in Pakistan, not government agents, who recommended that Pervez invent a false end use for the steel. Pervez was instructed by Multinational to invent any end use that would satisfy U.S. Customs Agents. App. at 63a. In addition, we find no evidence that government agents suggested to Pervez that it was lawful or accepted practice for Pervez to falsify the export application. Rovello told Pervez that if the end use were legitimate and if there were an on-site inspection, the Department of Commerce might approve the application. App. at 1411a–13a. Rovello did not suggest that Pervez fabricate a non-nuclear end use in order to obtain the export license if the maraging steel was actually intended for nuclear application in Pakistan. Consequently, we find that this evidence would not have required a jury charge on entrapment, and that Pervez is not entitled to a new trial on these counts.

---

**7.** We recognize that the trial judge properly applied the law on entrapment in effect at that time.

**8.** The record indicates that at the beginning of the trial, Pervez intended to plead entrapment to Count Five, then changed his mind after the close of evidence, and finally decided before closing arguments to admit the elements of Count Five and claim entrapment. In his brief, Pervez described himself "on the horns of a dilemma" on whether to admit the elements of the count. Appellant's brief at 25.

■ Moreover, we find that Pervez's admission of the elements of the beryllium charge to claim entrapment, necessitating vacatur of Pervez's conviction of Counts One and Five under the plain error doctrine, did not "spill-over" and affect the validity of Pervez's conviction on Counts Six, Seven, and Eight. *See Berkery,* 865 F.2d 590. Counts Six to Eight involve Pervez's false documentation of the end use for maraging steel only and do not refer to the export of beryllium. Consequently, Pervez's admission of the beryllium charges, which may have "tainted" the jury's consideration of Count One and which rendered Pervez's conviction on Count Five invalid, would not have tainted the jury's consideration of Counts Six, Seven and Eight.

Pervez also contends that, based on the evidence presented at trial, he is entitled to an acquittal as a matter of law because he was entrapped on Counts Six, Seven and Eight. For the reasons already stated denying Pervez's request for a new trial, we do not find that the record provides undisputed proof under *Gambino* that Pervez was entrapped by government agents as a matter of law. *See Gambino,* 788 F.2d at 944.

■ In addition, Pervez contends that the jury's acquittal on the bribery charges should carry with it an acquittal on the false documentation charges based on a theory of entrapment because "submission of the [false] documents was part and parcel of the payment to Rovello." Appellant's brief at 22. This argument ignores the fact that more than one unlawful act was required on the part of Pervez before the application would be approved. The jury's acquittal on the bribery charges, presumably based on Pervez's entrapment defense, does not implicate his conviction on falsification of documents required to obtain an export license. Each illegal act is a separate crime. Each act was undertaken by Pervez. They are separate acts undertaken independently of the other, and thus acquittal on one offense does not necessitate acquittal on the other.

■ In *United States v. Bay,* 852 F.2d 702 (3d Cir.1988), a case remanded to this court in light of *Mathews,* 108 S.Ct. 1724, 100 L.Ed.2d 189 (1988), we determined that an inquiry under *Mathews* requires two steps: "first, whether the record discloses sufficient evidence from which the jury could have found entrapment; and second, whether [the defendant] can show that he could have adduced sufficient evidence he had been given the opportunity to do so." 852 F.2d at 704. Although we have found that the record does not disclose sufficient evidence of entrapment to have warranted an entrapment instruction or acquittal, as in *Bay,* we find that we cannot resolve the second question on appeal. Therefore, we will remand to the district court for a proffer hearing to allow Pervez to present any evidence of entrapment not already in the record. "If the court decides that there is sufficient evidence to present the issue to the jury, a new trial will be required, but if [Pervez] has no further evidence, or if the court decides that all the evidence together still would not warrant a jury verdict, the convictions will stand." *Id.* at 705.

### IV.

Pervez also raises other issues on appeal, asserting that insufficient evidence existed to support his convictions, and that the district court erred in refusing to admit certain expert testimony, in failing to strike two jurors for cause, and in failing to give an augmented jury charge. We have decided to remand for a new trial on Counts One and Five. On Counts Six, Seven, and Eight, we find that sufficient evidence exists to support his convictions; but for the intervention of *Mathews* requiring remand under *Bay,* we would have affirmed Pervez's conviction on these counts. We will affirm the district court on the other contested rulings.

### V.

Accordingly, we will vacate Pervez's conviction and remand for a new trial on

Counts One and Five. On Counts Six, Seven and Eight, we will remand for a proffer hearing at which the defendant may offer evidence of entrapment that he may not have offered due to the trial court's ruling under the pre-*Mathews* rule. At the *Bay* hearing, the district court will evaluate additional evidence on entrapment presented by Pervez. If sufficient evidence is proffered to warrant an entrapment charge, a new trial will be required. If no further evidence is offered, or if all the evidence together would not warrant a jury verdict, the convictions will stand. *Bay*, 852 F.2d at 705. Moreover, because we have vacated Pervez's conviction and remanded for a new trial on Counts One and Five, we will also vacate the sentences and remand to the district court for resentencing. *United States v. Beros*, 833 F.2d 455, 467 n. 13 (3d Cir.1987) (citing *United States v. Busic*, 639 F.2d 940 (3d Cir.), *cert. denied*, 452 U.S. 918, 101 S.Ct. 3055, 69 L.Ed.2d 422 (1981)).

### ORDER

The petition for rehearing filed by appellant, in the above-entitled case having been submitted to the judges who participated in the decision of this Court, and no judge who concurred in the decision having asked for rehearing, and none of the members of the panel having voted for rehearing, the petition for rehearing is denied.[1]

---

1. On remand, the district court may, of course, consider any arguments raised by appellant regarding the application of *United States v. Sala-mone*, No. 84–00150, slip op. (3d Cir. January 18, 1989).