153 Ill. App.3d 245 (1987)
505 N.E.2d 1272
THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v.
ALLEN CANNON, Defendant-Appellant.
No. 83-2439.
Illinois Appellate Court  First District (5th Division).
Opinion filed March 13, 1987.
James J. Doherty, Public Defender, of Chicago (Clyde Lemons, Jr., Assistant Public Defender, of counsel), for appellant.
Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Maureen A. Harton, Assistant State's Attorneys, of counsel), for the People.
Reversed and remanded.
JUSTICE PINCHAM delivered the opinion of the court:
Defendant was charged with the offenses of robbery, residential *246 burglary, aggravated battery, and home invasion. He was tried by a jury in the circuit court of Cook County and found guilty of robbery and residential burglary (Ill. Rev. Stat. 1985, ch. 38, pars. 18-1, 19-3) and not guilty of the remaining charges. He was sentenced to 13 years' imprisonment in the Illinois Department of Corrections on the residential-burglary conviction. On this appeal, defendant contends that he was denied his constitutional rights to a fair trial and to be tried by an impartial jury because the State used its peremptory challenges to exclude all black citizens from his jury.
The record reveals that during the selection of the first panel of four jurors, the State exercised four peremptory challenges, one of which was against a white citizen. At the conclusion of the selection of the first panel, the defendant's attorney moved for a mistrial in the following language:
"Your honor, at this time I will make a formal motion for a mistrial, based upon the State's misuse of their challenges to the jury. [T]he State has used * * * four peremptory challenges, * * * three out of those four persons were Black; and, Judge, there is no other reason for any one of those jurors to have been excluded except for the fact that they were Black.
And there was nothing in their backgrounds that was adverse to any kind of interest, at least in the information that I had heard, unless the State has something to the contrary.
And the State is once again attempting at this time to deprive the Defendant of his Fifth, Sixth, and * * * Fourteenth Amendment Rights under the United States Constitution.
* * *
And I move to declare a mistrial.
* * *
I think that the State * * * [is] using their peremptory challenges primarily, not only primarily, but solely for the purpose of excluding Blacks."
The assistant State's Attorney responded that the State was not engaged in the systematic exclusion of blacks and pointed out that the victim in the case was a black woman.
The trial judge ruled:
"I am of the opinion that the Supreme Court of Illinois has now definitively said that the State has the unfettered right to use its peremptory challenges in any fashion that the State's Attorney sees fit, and that they are not to be required to even state why, which is nothing new; but if anything is clear, it seems to me it is the law that the right to peremptory challenges *247 is an unfettered right. So your motion is denied."
After the 12 jurors and two alternate jurors were selected and sworn, the defendant's attorney made another motion for a mistrial in the following language:
"I will once again be asking for a Mis-trial. I would like the record to reflect that of other six peremptories * * * that the State has executed today, that five of them have been against Black persons * * *.
The only Black person the State accepted as a jury member was one who * * * is seated as an alternate.
* * *
I think that this is a very blatant example of racial discrimination on its face, and if this Court has no power to actually enjoin the State from participating in these kinds of practices, we may as well forget about the Fourteenth Amendment and the Fifth Amendment and the Sixth Amendment.
I think that this Court under such blatant, obvious, practices engaged in by the State had not only the right, and the duty, but the obligation to pursue a proper remedy * * * this Court can, as a matter of fact, declare a Mis-trial when it becomes obvious that the State is, as a matter of fact, trying to prevent the Defendant from getting a fair trial * * *.
[I]n this case, Judge, it is not only the case of racial discrimination but they are using their peremptory challenges by excluding people of the Defendant's race * * * in order to prevent the Defendant from getting a fair trial.
* * *
[T]he State's ability * * * to execute certain peremptory challenges here goes to the entire aspect whether this man simply because of the fact he is a Black man and even more important is as to how our own criminal justice system is viewed in toto by the community.
If this kind of a practice  if a Black man or a Black woman, or any Black person can step into this courtroom and say that simply because of the fact that you are Black you cannot serve impartially on this jury, then, as a matter of fact, we might as well all forget about even being here. We might as well all forget about saying there was such a thing as the Fourteenth Amendment in operation. * * *.
[T]he State had no good cause to excuse any of those Black people who they did excuse except for the fact that they were Black.

*248 * * *
Judge, we ask that your Honor * * * grant our motion for a Mis-trial because of the blatant activity and intentional activity engaged in by the State."
The assistant State's Attorney replied that "there has been no systematic exclusion of Blacks in this case." The trial judge ruled that the State had a right to exercise a certain number of peremptory challenges in a criminal case, that "the Supreme Court has now said that the word `peremptory' means that they need not give any kind of basis for the exercise of a peremptory challenge," and denied the motion for a mistrial.
The jury was selected in this case on September 6, 1983, evidence was presented on September 7 and 8, 1983, and on the last date the jury returned its guilty verdicts. The defendant was sentenced on October 7, 1983.
On April 30, 1986, the Supreme Court of the United States decided Batson v. Kentucky (1986), 476 U.S. 79, 90 L.Ed.2d 69, 106 S.Ct. 1712. In Batson, the prosecutor exercised four peremptory challenges against the four blacks on the venire. An all white jury was selected. The defendant's attorney asked that the jury be discharged on the ground that the prosecutor's exercise of the four challenges against the blacks violated the defendant's rights under the sixth and fourteenth amendments to a jury selected from a cross-section of the community and under the fourteenth amendment to equal protection of the laws.
The Supreme Court held in Batson that the equal protection clause of the fourteenth amendment prohibits the State from excluding members of a defendant's race from the jury venire on account of race or because of the false assumption that members of his race as a group are not qualified to serve as jurors. The court further held that the equal protection clause also prohibited a prosecutor from exercising peremptory challenges against jurors solely because of their race or on the assumption that black jurors will be unable to impartially consider the State's case against a black defendant and that for the State to deny a person participation in jury service on account of his race unconstitutionally discriminates against the excluded juror.
The court in Batson ruled that to establish a prima facie case that a prosecutor has purposefully discriminated by exercising peremptory challenges, a defendant need only show that he is a member of a cognizable racial group, that the peremptory challenges by the prosecutor have been exercised to remove members of the defendant's race from the jury, and that when the defendant establishes a prima *249 facie case, the burden is on the prosecutor to articulate a neutral explanation for excusing the black jurors. Because the prosecutor was not required by the trial court in Batson to so explain his removal of the black persons from the jury, the Supreme Court reversed the defendant's conviction for burglary and receipt of stolen property and remanded the case for further proceedings.
The case at bar was pending on review before this court when Batson was decided. The Supreme Court of the United States held on January 13, 1983, in Griffith v. Kentucky (1987), 479 U.S. ___, 93 L.Ed.2d 649, 107 S.Ct. 708, that the rule in Batson applies retroactively to all cases, State or Federal, pending on direct review or not yet final.
We have thoroughly reviewed the voir dire examination of the jurors who were excused by the State's exercise of peremptory challenges[1]. The record before us reveals prima facie, purposeful discrimination in the exclusion of the black jurors. We remand the cause and if the prosecutor of this case fails to come forward with a neutral explanation for his exclusion of the jurors, the trial court is ordered to set aside the defendant's conviction and grant him a new trial.
It is so ordered.
Reversed and remanded.
LORENZ and MURRAY, JJ., concur.

APPENDIX
"BRENDA PERKINS, was called as a prospective juror herein, having been first duly sworn, was examined and testified as follows:
VOIR DIRE EXAMINATION BY THE COURT:
Q. And Brenda Perkins?
A. Yes.
Q. You live on the south side of Chicago?
A. Yes.
Q. Is that correct?
A. Right.
Q. You are single?
A. Yes.
Q. Thirty-four years of age, and employed by the Illinois Bell Telephone Company?

*250 A. Right.
Q. As a Coin Collector?
A. Yes.
Q. Can you just say a few words about how you do that?
A. I have been in this building before collecting from the pay telephones. What you do is take the receptacle in the telephone, pull it out of the telephone, and replace an empty one.
Q. You travel around from place to place where there are public phones and take the money out?
A. Right.
Q. And bring that back to wherever they tell you to take it, right?
A. Right.
Q. Are you responsible for counting that money?
A. Sometimes. It depends on what building I am in. Like as of April I am in the Accounting Building, so I have been counting the money; but for two years prior to April, I was in the Collecting part of the office, so I was going out on the street collecting the money. When you collect the money, you just bring it in; you only count it when you are in the Counting Room.
Q. What do you do with the money?
A. It is a tin can. It is already in the telephone, when you pull it out, it automatically locks; then you put an empty can in.
Q. It is more complicated than I thought. (Laughter)
THE COURT: Now, then you have had previous jury duty?
A. I've been called five times.
Q. In the Daley Center?
A. Yes: Three times.
Q. How long ago?
A. About four years ago was the last time, that was the Daley Center.
Q. Did you sit on a case?
A. Yes.
Q. And decided it?
A. Yes.
Q. What was the nature of the case you heard?
A. A stabbing.
Q. A stabbing?
A. Yes.
Q. So you were able, together with the other jurors, to decide *251 it?
A. Correct.
Q. So what I said about the presumption of innocence and proof beyond a reasonable doubt * * * the right to remain silent * * * are not new to you?
A. No.
Q. So you answered every other question in the negative, right?
A. Correct.
Q. And you say you have two children: one, 19, and one, 16?
A. Correct.
Q. Did those children attend school in a neighborhood school of the city of Chicago?
A. Yes.
Q. Can you say to Mr. Jurewicz and Mr. Smoke or Mr. Cannon, and to Mr. Groark and Mr. Perry on behalf of the People, that you can give each side a fair and impartial trial?
A. Yes, I can."
* * *
"PATRICIA J. WAGNER, was called as a prospective juror herein, having been first duly sworn, was examined and testified as follows:
VOIR DIRE EXAMINATION BY THE COURT:
Q. Now, Patricia J. Wagner of Chicago, on the south side?
A. Right.
Q. And you are employed at the Chicago Ridge Nursing Center?
A. Yes.
Q. Your age is 27?
A. Yes.
Q. You are a single woman?
A. Yes.
Q. Right.
A. Right.
Q. And you work at the Chicago Ridge Nursing Center  I see you say an `Activity Aid'?
A. Right.
Q. Now then tell us what you did in your occupation?
A. I am responsible for the residents to, you know, have different types of activities; to keep them busy, such as Bingo and just discussion groups. I am under a director and write notices, *252 and keep them busy, so they have things to do, and talk with them, and keep them company.
Q. How long have you worked there?
A. Nine months.
Q. What did you do prior to working at the nursing home?
A. I worked at the Central Community Hospital.
Q. Where is that?
A. 57th and Wood.
Q. In the city?
A. Right, Chicago.
Q. Has all of your employment then been connected to the sick, convalescence, or aged in either hospitals or nursing centers?
A. No. It has been a variety.
Q. What other jobs have you had?
A. I worked as a switchboard operator, mail room clerk, I worked at Burger King  I had quite a few different jobs.
Q. Did I ask you how long you had been in Chicago Ridge Nursing Center?
A. Yes.
Q. Tell me once again. I am getting old and forgetful.
A. I have been there nine months.
Q. You live at home with your parents?
A. Uhm-hmm.
Q. And this is your first jury duty?
A. Yes.
Q. You answered all of the questions, `No' except that some member of the family or a friend had been the victim of a crime.
A. Right.
Q. So who was the person, and what was the offense.
A. It was my mother, and it was an offense when somebody had taken her purse and broken her arm in three different spots. It happened about two or three years ago, something like that.
Q. How long ago?
A. About two or three years ago, I am not really sure how long ago it happened.
Q. Was she hospitalized?
A. Yes, she went to the Emergency Room at Holy Cross but I didn't go to the hospital or anything like that.
Q. Did that happen in Chicago?

*253 A. Yes, it happened at 66th and Artesian.
Q. Did the police accomplish anything for you?
A. They did not find anybody, no, but is was reported and everything.
Q. Was your mother capable of telling or describing the person that did it, if you know?
A. No, I am not really sure, because I was not there. I came home and found out that that happened, so 
Q. Well, would there be anything within that experience in the family that would inhibit you from giving a fair trial to Mr. Cannon?
A. I don't think so.
Q. Well, you know now if you are selected to serve, you may have to take an oath to serve fairly and impartially, right?
A. Yes, I do.
Q. Do you know Mr. Jurewicz and his client, Mr. Cannon, will rely on you to live up to the terms of your oath, to be fair and to be impartial, as will Mr. Perry and Mr. Groark. So can you say now to them that you will be a fair and impartial juror?
A. I really don't feel that I should be on this case.
Q. Why? Because of what happened to your mother?
A. No, not because of that; because I am just unsure, you know.
Q. What is the reason?
A. Because I really  I feel it is an important decision, you know, to say yes or say no. I am not really sure.
THE COURT: I am not sure I understand you. Very well, I will tender to the State Ms. Lally, Ms. Perkins, Mrs. Orzechowski, and Patricia Wagner.
MR. GROARK: With our thanks, the People would excuse Ms. Perkins and Ms. Wagner.
THE COURT: All right. Thank you.
(Jurors excused)"
* * *
"KENDRICK P. GUENO, was called as a prospective juror herein, having been first duly sworn, was examined and testified as follows:
VOIR DIRE EXAMINATION BY THE COURT
Q. Now, Mr. Kendrick P. Gueno.
A. It is Gueno.
Q. You live in Chicago, and I guess in the area of  or that is *254 better known as Beverly?
A. Beverly  Morgan Park.
Q. Beverly Hills?
A. Beverly  Morgan Park.
Q. Beverly Hills, they don't use that in Beverly, do they? That is California, right?
A. Right.
Q. Do they say in that area that it is Beverly Hills?
A. They say Beverly.
Q. Just Beverly. And you are employed in InterLake?
A. Yes: InterLake Steel.
Q. And InterLake Steel is in Chicago?
A. It is in Riverdale.
Q. Beg your pardon? All right. The big plant is in Riverdale?
A. Correct.
Q. And you are married?
A. (Nodding head affirmatively)
Q. Your wife is employed at the University of Chicago?
A. That's correct.
Q. As a clerk?
A. Yes.
Q. And you and your wife have one child who is 10 years of age?
A. That's correct.
Q. Is that a man or a woman?
A. Female.
Q. And does your daughter then attend the local schools?
A. Yes.
Q. And at the place where you and your wife reside  is it a home?
A. Yes, we bought the home.
Q. How long have you been employed at InterLake?
A. About 15 years.
Q. Now, have you always been at the place, at the operation in Riverdale?
A. Correct.
Q. This is your first jury duty?
A. Yes.
Q. Now, you have answered every question in the negative: No trouble with the law?
A. No.
Q. No trouble with the civil law, right?

*255 A. That's correct.
Q. No thefts in the family, or anything of that nature?
A. That's correct.
Q. So is there anything about this case then, sir, that would prevent you from giving the Defendant, Mr. Cannon, or the State of Illinois, a fair and impartial trial?
A. No, there is nothing.
THE COURT: Mr. Groark, I will tender now to you Ms. Linda Sharp and Mr. Gueno of Chicago and Lansing.
MR. GROARK: Thank you. With our thanks, Your Honor, we would excuse Mr. Gueno.
THE COURT: If you would please step down. You are excused now, sir. You get your pay check and you are free to leave. And we thank you for coming. (Juror excused)"
* * *
"HOPI M. BRONSON, was called as a prospective juror herein, having been previously duly sworn, was examined and testified as follows:
VOIR DIRE EXAMINATION BY THE COURT:
Q. Mr. Hopi M. Bronson of the south side of Chicago.
A. Bronson.
Q. You are a married man, and employed at the National Railroad Passenger Corporation?
A. Amtrak for short.
Q. Amtrak?
A. Amtrak.
Q. Right?
A. Right.
Q. Is that the official name of it?
A. National Railroad Passenger Corporation, right.
Q. And you are a Lead Service Attendant?
A. Right.
Q. What does that entail?
A. That is onboard train service attendant lounge car.
Q. How long have you been so employed?
A. Thirty years.
Q. Now, has Amtrak been in existence that long?
A. They've been in existence about 12 years.
Q. Did the train that you are now on or with  the same train under the same name `Amtrak'?
A. No, I was with the Burlington Railroad.

*256 Q. Burlington Northern Railroad, same railroad?
A. Every railroad is different. They had a different railroad, but when Amtrak come in they took over all the railroads, and I was doing the same type of service.
Q. What do you do?
A. In charge of the lounge car, snack car, whatever.
Q. And where do you go?
A. New York.
Q. Back and forth?
A. Yes.
Q. So when you are at work, how long are you gone on a trip to New York?
A. Well, it involves three days, then I get three days off.
Q. Then you have a couple of days off, then go back?
A. Three off, right.
Q. And Mrs. Bronson is employed by the Board of Education of the City of Chicago as a kitchen helper?
A. Right.
Q. How long, to your recollection, has Mrs. Bronson been with the Board of Education?
A. About three years.
Q. And you have one child, and that child is 22 years of age?
A. One at home. Just one at home, the rest of them grown.
Q. Is that child a man or a woman?
A. Female, woman.
Q. Working?
A. Going to school.
Q. In Chicago?
A. Right.
Q. So she is a college student, or post graduate student?
A. Right, college student.
Q. Is she single?
A. Right.
Q. And you served previously on a jury trial?
A. As an alternate.
Q. As an alternate juror?
A. Yes.
Q. Where?
A. Daley Center, last November.
Q. Then it was a civil trial?
A. Right.
Q. And was it an action brought by a person that was injured?

*257 A. Eviction type.
Q. What?
A. Eviction type.
Q. So you recognize that there is a substantial difference in the quantity and quality of the proof between a criminal and civil case?
A. Right.
Q. That proof beyond a reasonable doubt is far greater than the proof required in civil law, which is that the person suing prove his claim by the greater weight, or by the preponderance of the evidence?
A. Right.
Q. Now, in that case where you were the alternate juror, did the case go to the jury?
A. Right. I did not sit in on that.
Q. You did not get in on it?
A. On the decision-making, no.
Q. And that case was then heard in the Daley Center, right?
A. Right.
Q. So from that point on in terms of your questionnaire, every answer is `No'?
A. Right.
Q. So is there anything about this case that would prevent you from being a fair and impartial juror, Mr. Bronson?
A. No.
THE COURT: Thank you.
* * *
I forgot, Mr. Bronson  I meant to ask: To perform your job on the railroad, the Amtrak, are you required to belong to a union?
MR. BRONSON: Yes.
THE COURT: What is the name of that union?
MR. BRONSON: Hotel and Restaurant Workers.
THE COURT: Thank you. Now, Mr. Butler, you are a janitor for the Chicago Board of Education?
MR. BUTLER: Yes.
THE COURT: Q. And you are 66 years of age?
A. Right.
Q. And in that regard, as to the title or the word `janitor' is not the job designation, is it? You are a custodial engineer?
A. It is `custodian worker, CW.'

*258 Q. Now, in that position do you have to belong to a labor union to hold that job?
A. Right.
Q. You do?
A. Right, yes.
Q. And where is the school facility of the Chicago Board of Education where you work?
A. 55th and Lowe.
Q. 55th and Lowe?
A. L-o-w-e.
Q. Loomis?
A. Lowe: L-o-w-e. 55th and Lowe.
Q. Oh, yes, sure. What is the name of that school?
A. Hope.
Q. Mrs. Butler is at the Cook County School of Nursing as a nurse?
A. Yes.
Q. So does she teach nursing?
A. No, she is a practical nurse.
Q. You have two children: 35 and 39?
A. Right.
Q. Are any of the children employed in  Are either of the children employed in a law enforcement occupation?
A. Well, my son is a truant officer.
Q. For the Board of Education?
A. No. He works in the kid's Court  What do you call it  Juvenile Court.
Q. He works there?
A. Yes, he is a truant officer.
Q. So he is employed by the Circuit Court of Cook County?
A. Yes, sir.
Q. What does he do?
A. He works with kids at Court.
Q. What does he call it?
A. I don't know, I just call him  he is just a truant officer. He don't tell me anything. I don't know.
Q. How long has he been employed at Juvenile Court?
A. About 10 years, I guess.
Q. Which one is that, the 35-year-old?
A. That is the son, 35.
Q. Is he married?
A. He is married.

*259 Q. Has his own family?
A. He has a home, hasn't got any kids.
Q. Has his own home in Chicago?
A. Right.
Q. The 39-year-old?
A. A daughter. She is living in Skokie.
Q. What does she do?
A. She is unemployed now.
Q. She lives in Skokie?
A. Yes, she lives in Skokie.
Q. Is she married?
A. She is married.
Q. What does her husband do?
A. Assistant to Ruth Love, the Board of Education. He is on her staff, the Board of Education.
Q. Now, do they have children?
A. They have three.
Q. And they all go to school out there in Skokie?
A. Yes, sir.
Q. Except for the question: Has any member of your immediate family or close friend ever been the victim of a crime? You answer all the others `No.' Who was it?
A. Was a victim, it was my sister-in-law.
Q. Your sister-in-law?
A. My sister-in-law.
Q. Now, what happened to her? How long ago was it?
A. That has been about 10 years ago  she was beat and raped.
Q. Where did that happen?
A. It happened at 35th and Calumet.
Q. In Chicago?
A. In Chicago.
Q. If you know, Mr. Butler, was anybody apprehended?
A. They got the guy.
Q. They got him?
A. (Nodding head affirmatively)
Q. Was he tried?
A. Seven years.
Q. Was he tried?
A. He got seven years.
Q. Then he was tried? (Laughter) Did he have a trial, if you know?

*260 A. They had a trial.
Q. Would that circumstance inhibit you from being a fair and impartial juror?
A. I don't think so, no.
Q. You say you have a friend or a member of the family who is a Public Defender?
A. I thought it would come under  the truant officer. That's why I didn't put it that way.
Q. All right. When you put the mark under the Public Defender, you meant your son works in Juvenile Court?
A. Right.
Q. Now, can you be a fair and impartial juror here?
A. I think I can.
* * *
MR. GROARK: With the People's thanks, your Honor, we would excuse Mr. Bronson."
* * *
"MARY WILLIAMS, was called as a prospective juror herein, having been previously duly sworn, was examined and testified as follows:
VOIR DIRE EXAMINATION BY THE COURT:
Q. Mary Williams.
A. Yes.
Q. You reside down on the south side of Chicago?
A. Yes.
Q. And you are a single woman?
A. No, I am married.
Q. And you, at the present time, are not employed?
A. No.
Q. Is your husband employed?
A. No.
Q. And how long has your husband been unemployed?
A. Well, he got hurt in 1979 on his job, working at galvanizing on Cicero, got some galvanizing in his eyes.
Q. Is he disabled?
A. Yes: On Social Security Disability.
Q. What was he doing when he was injured?
A. Working: Brightly Galvanize.
Q. What?
A. Brightly Galvanize.
Q. You have two children?

*261 A. Yes.
Q. Are they both at home: 15 and 16?
A. Yes. I have two at home. I have eight children, I have only two at home.
Q. Go to school?
A. Yes, high school.
Q. This is your first experience at jury duty?
A. Yes, it is.
A. You indicate that  or you did not answer the question that asked if you have ever been the victim of a crime?
A. No, I have not.
Q. The answer is no?
A. Yes.
Q. You do say that some member of your immediate family or a close friend has been the victim of a crime?
A. Well, my son.
Q. Which one?
A. My third son.
Q. The first one?
A. The third son.
Q. Uh?
A. My third one.
Q. What did she say?
THE REPORTER: My third son.
THE WITNESS: I have six boys. I got two at home, the rest not home  is married.
THE COURT: Q. One of the ones that is not home, something happened to him. What was it?
A. He is in the penitentiary. He is in jail. He is the one that did the crime.
Q. All right. So all the other questions you answered: `No.'
A. Yes.
Q. Can you be a fair and impartial juror in this case, if selected?
A. Surely.
THE COURT: Very good. Thank you, Mrs. Williams. All right. I will tender Mary Williams.
MR. JUREWICZ: Thank you, your Honor. Your Honor, the Defendant will accept the panel as presently constituted.
THE COURT: Very good. Thank you.
MR. JUREWICZ: Tender to the State.
MR. GROARK: With thanks, Your Honor, the People would *262 excuse Mrs. Williams.
THE COURT: Will you step down, Mrs. Williams. Thank you. And Mr. Young will tell you how to get your pay, and then leave here, if you will, please madam. (Juror excused)"
* * *
"CLARENCE GREENWOOD, was called as a prospective juror herein, having been previously duly sworn, was examined and testified as follows:
VOIR DIRE EXAMINATION BY THE COURT:
Q. Clarence Greenwood.
A. That's 
Q. Of Chicago?
A. Yes.
Q. South side?
A. South Chicago.
Q. You are presently unemployed?
A. That's right.
Q. On the other hand, Mrs. Greenwood is a machine operator at General Foods?
A. That's correct.
Q. You, together with Mrs. Greenwood, own your own home and have three children?
A. That's correct.
Q. Any of the children in law enforcement occupations?
A. No.
Q. Are any one or two or three of them still at home?
A. One.
Q. Which one?
A. The baby.
Q. The baby, the 21-year-old baby?
A. Right. She is going to college.
Q. Where?
A. St. Xavier.
Q. On the south side?
A. Right, at 103rd.
Q. 103rd and Central, right?
A. Right.
Q. Is she a senior?
A. Senior.
Q. Is it true that that is a coeducational college?
A. Yes. She is going into the medical field.

*263 Q. She, of course, is single?
A. Right.
Q. Living at home?
A. Right.
Q. Where is the 25-year-old?
A. She is married and she is working at Sears.
Q. Where is she living, in Chicago?
A. Chicago.
Q. What does her husband do?
A. He is working.
Q. Doing what?
A. He is in construction, works for construction.
Q. The 26-year-old?
A. She is not married.
Q. She's at home?
A. No, she rents.
Q. She has her own place?
A. Right.
Q. Is she working?
A. Working for the First National Bank of Chicago.
Q. Downtown in the loop?
A. In the loop.
Q. In Chicago?
A. Correct.
Q. Now, how long ago did you have jury duty?
A. Well, it is my third time being called. First one was about eight years ago in the Civic Center, and I served on jury duty two years ago at Maybrook Court.
Q. Where?
A. Maybrook Court.
Q. Was that a criminal case at Maybrook?
A. Yes.
Q. Do you remember the kind of case it was?
A. It was domestic, so I guess that is civil.
Q. Domestic?
A. Family.
Q. Family fight?
A. Right.
Q. Well, it was a dispute?
A. Something like that, yes.
Q. Between a husband and a wife?
A. No, this was a step-daughter and mother.

*264 Q. But it was civil?
A. I guess it was civil.
Q. Was the State's Attorney a party to one side?
A. No.
Q. So you decided that case?
A. It was settled in the jury room.
Q. It was settled?
A. Right.
Q. Did you hear any other case or other jury experience?
A. No.
Q. Whatever that case was at Maybrook, if it was civil, all right; but you are certain it was not a criminal proceeding?
A. No, I don't think it was.
Q. At least the case was not tried on one side by the State's Attorney of Cook County?
A. No.
Q. That Maybrook experience was the only jury experience where you actually heard a case as a juror?
A. That's right.
Q. Right?
A. Right.
Q. And the time you were in the Daley Center, did you get on a case on that experience?
A. No, I did not get on one. I served ten days down there, you know, I went down there ten days, but I never served on a case.
Q. Now, when you served on the Maybrook case, was that one day  one case?
A. One day  one case.
Q. So that was a few years ago?
A. Right.
Q. Not very long ago?
A. Maybe two years ago.
Q. Two or three at the most, right?
A. Right.
Q. So is there any reservation in your mind about your ability in this case to give the Defendant a fair trial?
A. No.
Q. And likewise the People?
A. Right.
THE COURT: Thank you, Mr. Greenwood. I now tender Mr. Clarence Greenwood to Mr. Jurewicz.

*265 MR. JUREWICZ: Yes, Your Honor, thank you. Your Honor, the Defendant will accept the panel as presently constituted, and tender to the State.
MR. GROARK: With the People's thanks, Your Honor, we would excuse Mr. Greenwood.
THE COURT: Mr. Greenwood, you have been excused by the People of the State of Illinois."
NOTES
[1] We attach as an appendix the voir dire examination of the excused jurors.