Anthony MORRIS, Appellant,

v.

STATE of Missouri, Respondent.

No. 54537.

Missouri Court of Appeals,
Eastern District,
Division Four.

Dec. 6, 1988.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 4, 1989.

Application to Transfer Denied
Feb. 14, 1989.

Janis C. Good, Dave Hemingway, St. Louis, for appellant.

John M. Morris, III, Jefferson City, for respondent.

SATZ, Judge.

Movant, Anthony Morris, appeals the denial of his Rule 27.26 motion. We affirm.

Movant was convicted by a jury of capital murder, § 565.001 RSMo 1978. He was sentenced to life imprisonment, without eli-

gibility for probation or parole for fifty years. § 565.008 RSMo 1978. On direct appeal, his conviction and sentence were affirmed. *State v. Morris,* 639 S.W.2d 589 (Mo. banc 1982), *cert. denied* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

At the hearing on the motion, the trial court took judicial notice of the record of movant's original trial. In *State v. Morris, supra,* our Supreme Court synopsized the facts established at that trial. We use that synopsis without further attribution.

On the evening of September 26, 1980, movant met Robert Hills, a cousin, at a bar. Hills and Edward Wallace, a neighbor who had accompanied Hills to the bar, drove movant home. Movant picked up a shotgun, returned to the car and found Hills and Wallace arguing over a woman.

Sometime later that evening, Pierce Bush, who lives across from Sherman Park, thought he heard a backfire or gunshot. He went out on his porch and saw two men, Hills and Wallace, fighting across the street, near the park. Bush saw Hills hit Wallace several times and saw movant step in and also hit Wallace. Movant held the shotgun in his hand during the entire incident. Wallace attempted to leave by climbing a hill into the Park. Movant and Hills followed Wallace, caught up with him and began hitting Wallace again. Hills then walked away to urinate. Bush could hear parts of the conversation between movant and Wallace. Bush heard movant say: "you think I'm bullshitting"; then, Bush saw movant shoot Wallace, reload the gun, nudge Wallace with his foot and order him to "get up."

Bush called the police. When they arrived, they saw movant and Hills standing over Wallace; movant was holding the shotgun. After a short chase, movant and Hills were apprehended. Wallace bled to death, and movant and Hills were charged with his murder.

Hills' charge was severed from movant's charge. Hills was tried before movant, convicted of second degree murder and sentenced to 25 years imprisonment. His con-viction and sentence were affirmed on appeal. *State v. Hills,* 645 S.W.2d 57 (Mo. App.1982).

Movant contends his trial counsel's representation was ineffective on several different grounds. Movant first contends his trial counsel "denied" him his right to testify and "prevented" him from exercising that right. Movant admits he "was advised of his right to testify or remain silent", but he argues his trial counsel "refused to abide by [movant's] decision [to testify]" and this refusal "coerced [movant] to waive his right to testify." This contention is not supported by the record.

■ We take the record as we find it, and so must movant's counsel on appeal.[1] The motion court determines the credibility of the witnesses. Rule 73.01(c)(2); e.g. *Gallimore v. State,* 660 S.W.2d 458, 459 (Mo.App.1983). Movant's testimony at the hearing was contradicted by and was inconsistent with the testimony of his trial counsel. The trial court chose to credit the testimony of movant's trial counsel, and we defer to that determination. Rule 27.26(j).

Aside from movant's discredited testimony that his trial counsel "wouldn't put me on," there is no evidence that movant was "denied" his right to testify, "prevented" from exercising it or "coerced" into waiving it. All the evidence is to the contrary.

Movant's trial counsel was no unprepared neophyte. At the time of trial, movant's trial counsel had been an assistant public defender for about six years and had tried over one hundred felony cases. To prepare for trial, she discussed the case with movant on "numerous occasions," told him who the state's witnesses would be and explained the state's case against him. She, with another attorney from her office and her investigator, talked to Bush, the state's eyewitness, and to other people in the neighborhood of Sherman Park. They took photographs of the scene, marked locations in the park and paced off distances. Prior to trial, movant's trial counsel took Bush's deposition, and she talked with mov-

1. Movant's counsel on appeal was not movant's     counsel at the hearing on the motion.

ant about possible witnesses for his defense.

With this as background, movant's trial counsel discussed the right to testify with movant prior to trial. Although she could not recall the specifics of these discussions which occurred some six years prior to the present hearing, she said her practice was to allow her clients to make the decision whether to testify. Her testimony about her discussions with movant is somewhat garbled in the record. According to the transcript, she said:

> "I recall that the discussion in this particular case with the defendant and the final decision as to whether a client is going to testify is up to them."

She would tell every client her opinion of their proposed testimony. She did recall that movant's proposed testimony

> "was so inconsistent with the rest ... of the testimony and evidence in the case ... [that] I think he would [have] hurt himself.... I didn't find what he [would] say believable. I don't think the jury would have found it believable either."
>
> ....
>
> [A]lmost everything that [movant] was going to say was inconsistent with not only the other testimony in the case but with ... some of the exhibits.... [H]is testimony [would have been] basically totally different than every other piece of ... evidence in the case".

This evaluation is consistent with the fact that movant had given at least three different statements to the police. Although not explicitly stated in the record, movant's trial counsel apparently advised movant not to testify. The trial court found this advice acceptable trial strategy, rather than "coercion", and so do we.

Movant next contends his trial counsel was ineffective because she failed to request an instruction on voluntary intoxi-

cation. Movant's charge of capital murder required the state to prove that movant "unlawfully, willfully, knowingly, deliberately and with premeditation" killed another. § 565.001 RSMo 1978. Movant contends the evidence at trial supported a defense of voluntary intoxication, and, if that defense had been submitted to the jury, movant argues, the evidence would have "provided a reasonable basis for the jury to find that his intoxication negated a coolly deliberated, premeditated intent to kill." Had the jury been instructed on the "mitigating circumstances of voluntary intoxication", movant reasons, he "would have been convicted of a more accurate, lesser degree of homicide."

Movant's argument is defective for a number of reasons. We discuss only one.

In Missouri, the defense of voluntary intoxication was a valid defense to certain crimes from January 1, 1979, § 562.076 RSMo 1978, until October 1, 1984, § 562.076 RSMo Supp.1984. Under that statute, intoxication of sufficient degree "[n]egatives the existence of the mental states of purpose or knowledge when such mental states are elements of the offense charged...." § 562.076 RSMo 1978. The Comment to this statute explained the statute's limited application as well as the difficulty in raising the defense of intoxication:

> The code section brings Missouri law on this point into line with that of nearly every other state and reaches a more logical result. The change will not be of any great benefit to drunks as it will be very difficult to establish that a person was so intoxicated as to not know something when his actions indicate that he did know.[2]

This difficulty was reflected in the repeated holdings that an instruction on the defense of intoxication was proper only when the evidence of the defendant's "intoxication was so extreme he did not know what he was doing." *Anderson v. State*,

---

2. The Comment continues:

Even if the defendant was so intoxicated as to not have the purpose or knowledge required by a particular crime, the result in most instances will not be an acquittal but simply a finding of guilt of a lesser degree of

the crime—a degree which does not require the mental elements of purpose or knowledge. The section is limited to negativing the mental states of purpose and knowledge. It does not apply to any crime that can be committed with recklessness or criminal negligence.

747 S.W.2d 281, 284 (Mo.App.1988); *e.g.*, *State v. Bienkowski*, 624 S.W.2d 107, 108 (Mo.App.1981).

■ Contrary to defendant's contention, the trial evidence of his drinking did not support this defense. The eyewitness Bush testified on direct examination that he saw the two attackers, defendant and Hill, try to follow the victim, Wallace, up a steep hill in Sherman Park, but they couldn't make it, they "kept sliding, slipping down". On cross-examination, with reference to this attempt to climb the hill, Bush said:

Q. ... Did you see them staggering.
A. He looked to be high.
Q. Who did?
A. All of them.
Q. They looked to be drunk.
A. Yeah, he was drunk.

Officer Jacobsmeyer also testified defendant told him that he had "several drinks ... [and] he had danced a couple of dances" at the bar.

Bush's characterization or description of movant, or of all the parties, is questionable at best. Bush saw movant from a distance, not up close. The slipping and sliding could just as easily have been caused by the slope of the hill as by intoxication. At best for movant, this would be only minimal evidence of intoxication, and certainly would not show movant was so drunk he did not know what he was doing. Thus, this evidence would not warrant an instruction on voluntary intoxication. *See, e.g.*, *Ingram v. State*, 686 S.W.2d 36, 37 (Mo.App.1985).

Admittedly, at the hearing below, movant testified that he and Jessie Langston drank a pint of Canadian Mist, a fifth of Mogan David wine, and some beer. Movant's testimony, however, was not credited. The testimony of movant's trial counsel was credited. She said she recalled that either "one or all the parties [movant, Hill and Wallace] had been drinking", or only "[Hill] and Earl [Wallace]" had been drinking. In either event, she said: "If I thought the defense was appropriate, I would [have] raised it." On this record, movant's trial counsel cannot be faulted for

failure to request an instruction on voluntary intoxication.

■ Movant's next complaint centers on the testimony of Alford Turner (Turner), a defense witness at trial. Turner is the father of co-defendant Hills and a great uncle of movant's. After some introductory questions by movant's trial counsel on direct examination, the following exchange occurred:

Q. You have some interest in this particular case, do you not?
A. Yeah, my son was convicted and Anthony Morris ...

Counsel immediately changed the subject of her inquiry, but, at this point, did not ask for any relief. After calling the next witness, counsel approached the bench, reminded the court that her last witness had referred to co-defendant Hills and said

"I don't think I'm in a position ..., at this point to complain about it, ... but I would like to instruct this [next] witness to be careful about that kind of thing."

On direct appeal, movant argued the trial court should have declared a mistrial *sua sponte*. Our Supreme Court held the trial court did not abuse its discretion in failing to do so, noting, however, that "the defense did not ask the trial court for any curative action regarding the statement." *State v. Morris, supra*, 639 S.W.2d at 593. Movant now contends his trial counsel was ineffective because she failed to request a curative instruction to the jury to disregard Turner's reference to Hills.

Turner's statement was improper and should not have been considered by the jury. Evidence of the disposition of a co-defendant's case is normally not admissible. *E.g. State v. McCarthy*, 567 S.W.2d 722, 723 (Mo.App.1978). Moreover, it may be prejudicial error for a prosecutor to make statements or elicit testimony that a co-defendant had been convicted or pled guilty to the same crime. *See, e.g., State v. Aubuchon*, 381 S.W.2d 807, 815–16 (Mo. 1964); *State v. Johnson*, 456 S.W.2d 1, 4 (Mo.1970) *cert. denied* 409 U.S. 859, 93 S.Ct. 144, 34 L.Ed.2d 105 (1972); *State v. Fenton*, 499 S.W.2d 813, 816 (Mo.App.

1973). "Since the codefendant was guilty, [the jury may infer] the defendant must be guilty", and this inference "violates the defendant's right to be tried on his own." *State v. McCarthy, supra,* 567 S.W.2d at 724. The fact the statement here was elicited by defense counsel from a defense witness does not lessen the possibility of this unacceptable inference. It is the degree of this possibility that governs our determination here.

To establish his claim of ineffective counsel, movant must prove (1) his trial counsel failed to provide that degree of skill and care that a reasonably competent attorney would have provided under the circumstances; and (2) movant was thereby prejudiced. *E.g. Sanders v. State,* 738 S.W.2d 856, 857 (Mo. banc 1987). Under the circumstances here, the failure of movant's trial counsel to ask for a curative instruction may have been an acceptable trial tactic, rather than proof of lack of skill or care. Trial counsel may not have wanted to emphasize Turner's improper comment. At the evidentiary hearing below, she was not asked about this failure. However, she was asked whether she "talked" to her witnesses, particularly Turner, about "stating or explaining or blurting out that the co-defendant had been convicted." She answered: "Yes, we discussed it." This is not the sign of an unprepared trial counsel who was surprised into ineffectiveness by Turner's testimony about this conversation. Nonetheless, for our purposes here, we shall assume trial counsel should have asked for a curative instruction. Movant still does not prevail.

To show prejudice here, movant must show there is a reasonable probability the outcome of the trial would have been different "but for" the failure of his trial counsel to ask for a curative instruction. *See Sanders v. State, supra,* 738 S.W.2d at 860–61. Movant contends the evidence against him was not strong. Given this weak evidence, movant contends, the curative instruction may not have resulted in an acquittal, but, he argues, the instruction

would have resulted in a conviction of second degree murder instead of capital murder.

To show the weakness of the state's evidence, movant reargues the credibility of the state's eyewitness, Bush, and, predictably, finds insufficient proof of "deliberation." Movant argues that testimony of the arresting officers renders Bush's testimony "suspect" for two reasons: first, the "conditions of observation" were poor due to darkness; second, there were "[n]umerous conflicts" between the officers' testimony and that of Bush. Having reviewed the transcript, we find movant's argument unpersuasive.

The crime scene was the baseball diamond at Sherman Park.[3] Several witnesses testified there were several overhead lights near the area. Across the street from the park, Bush viewed the shooting from his front porch. The prosecutor asked, "[H]ow would you describe the lighting, your ability to see?" Bush responded, "Good." Additionally, Bush testified that, by the time he saw the police car approach, the assailants had left the victim and were returning to their car.

Movant notes discrepancies between this testimony and that of the officers, but he overstates the degree of divergence. One of the officers, Robert Swapshire, testified that, from his vantage point, the area around the victim was dark, without lighting. However, Officer Daniel Crain's testimony was more consistent with Bush:

> "The lighting conditions were typical of nighttime viewing and with the street lights alone one couldn't see clearly. Or I should say, with the street lights in the park and on the streets, one can't see too clearly and that was why the scene was made clearer to us when the headlights of our vehicle shown on the area in which the subjects were.
>
> ... there was lighting in the area and the lighting was sufficient ... to see images."

3. Since movant has provided no photographs or other exhibits, our mental image of the area is derived solely from reading the transcript.

Both officers testified they saw two men standing over the victim as the police car approached.

The officers' testimony does not establish that the lighting was inadequate for Bush to observe the crime. Crain's testimony acknowledged sufficient lighting in the area. It should be noted, however, the officers' vantage point was entirely different from Bush's. Bush observed the events over a substantial period of time while standing still. The officers testified about their fist glimpse of the suspects from a moving vehicle, as they approached the crime scene from the opposite direction. Moreover, Swapshire, who was driving the car, can hardly be expected to have a clear recollection of lighting conditions outside the headlight beams.

Regarding the perceived conflicts in the testimony, we are not persuaded that Bush's credibility is substantially diminished. We have already determined the perceived conflict about the lighting of the baseball field is explicable. Bush's recollection of the defendants' location when the police car arrived differs from that of the officers. It is not clear, however, that these recollections referred to precisely the same point in time. If a conflict exists, it is a relatively minor one, especially given Bush's extensive trial testimony. We find nothing here to diminish the jury's confidence in the eyewitness testimony about the shooting.

Movant also argues that evidence of capital murder was "not overwhelming" because of the circumstances that led to the shooting. The shooting, movant argues, "grew out of a brawl over a woman following a night of drinking." These conditions were "not conducive to cool premeditation and deliberation." Therefore, movant contends, the reasonable probability exists that the jury avoided the difficult issue of movant's mental state and convicted him due to an improper inference derived from Turner's statement.

This argument is unsound for two reasons. First, evidence showed the woman was the girlfriend of co-defendant Hills; nothing in the record indicates that movant had any stake in the dispute between Hills and Wallace. Second, according to Bush, the alleged "brawl" consisted of movant and Hills following and repeatedly striking Wallace. Despite the beating, however, the victim took no action against his two attackers.

The jury found movant killed Wallace with premeditation and deliberation. We see no reason to disturb this finding.

Movant also contends the motion court erred because it did not address the issue of whether movant's trial counsel was ineffective for failing to object to the "state's discriminatory usage of peremptory strikes to remove black persons from [movant's] jury." Movant's contention is misdirected and, thus, misses the mark.

■ Prior to 1986, *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), set the standard for determining whether the state discriminated against a black defendant in the selection of black jurors. To make a prima facie showing of unacceptable discrimination under this standard, the defendant was required to show the state systematically excluded blacks from its venire panels or to show the prosecutor systemically used his peremptory challenges over a period of time to strike black persons from jury panels. *Swain* 380 U.S. at 209, 227, 85 S.Ct. at 830, 839, 13 L.Ed.2d at 766, 776. This standard was changed by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which permitted a defendant to show discrimination by the prosecutor's unacceptable use of his peremptory strikes in the defendant's own case. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722–23, 90 L.Ed.2d at 87. In January, 1987, the Court ruled that *Batson* applied prospectively and to all cases pending on direct appeal as of the date of the *Batson* decision: April 30, 1986. *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). Movant's direct appeal was decided on April 31, 1982, and his petition for a writ of certiorari was denied by the United States Supreme Court on March 21, 1983. *State v. Morris, supra.* Thus, the *Swain* standard rather than the *Batson* standard determines whether movant was discriminated against here.

The precise discrimination issue before us was raised by movant's appointed counsel in an amended motion. It is alleged that movant's trial counsel was ineffective because she failed "to object ... [to] the state's systematic exclusion of black juror's from the jury panel" and failed to "object to the use of peremptory strikes by the state to eliminate black jurors from the jury panel." This amended motion was filed on April 3, 1987 some three months after *Griffith v. Kentucky, supra.* Therefore, we assume movant's counsel knew the *Swain* standard rather than the *Batson* standard would apply to movant's original trial and, in turn, assume counsel made the allegations of discrimination under the *Swain* standard. Nonetheless, no evidence was adduced to support these allegations under the *Swain* standard in either of the two separate hearings held on the amended motion. We must conclude these allegations were abandoned.

Finally, movant contends the motion court did not address another of the issues raised in his motion. Movant filed a *pro se* motion. This motion, as noted, was amended by his appointed counsel. Then, apparently, without the consent or advice from his appointed counsel, movant filed a *pro se* second amended motion. In this motion, movant alleged the verdict director improperly instructed the jury to find movant guilty if it found either movant "or" Hills shot Wallace.

For our purposes here, we will assume this allegation was properly before the motion court. The fact the court did not address this issue works no prejudice against movant. This type of instructional error must be addressed on direct appeal. *E.g. Haslip v. State,* 717 S.W.2d 533, 536 (Mo.App.1986). It is not cognizable under Rule 27.26. *Id.*

Judgment affirmed.

SMITH, P.J., and STEPHAN, J., concur.