*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
DALY, HARRELL, and KORN
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Riley S. COLEMAN**
Operations Specialist Second Class (E-5), U.S. Navy
*Appellant*

**No. 202400173**

_____

Decided: 30 October 2025

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Rachel E. Trest

Sentence adjudged 1 March 2024 by a general court-martial tried at Naval Air Station Key West, Florida and Naval Air Station Jacksonville, Florida. Sentence in the Entry of Judgment: confinement for 120 days, reduction to the pay grade of E-1, forfeiture of $2,017.00 pay per month for four months, and a bad-conduct discharge.

For Appellant:
*Frank J. Spinner*
*Lieutenant Colonel Todd F. Eslinger, USMC*
*Captain Kyle W. Rodewald, USMC*

For Appellee:
*Commander John T. Cole, JAGC, USN*
*Major Mary C. Finnen, USMC*

*31 October 2025: Administrative Correction to add Appellate Defense Counsel*

Judge KORN delivered the opinion of the Court, in which Chief Judge DALY and Senior Judge HARRELL joined.

———————————————

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

———————————————

KORN, Judge:

A general court-martial composed of members with enlisted representation convicted Appellant of one specification of abusive sexual contact, one specification of assault consummated by a battery, and one specification of wrongful use of cocaine, in violation of Articles 120, 128 and 112a, Uniform Code of Military Justice (UCMJ).[1] The members sentenced Appellant to confinement for 120 days, reduction to the pay grade of E-1, forfeiture of $2,017.00 pay per month for four months, and a bad-conduct discharge.

Appellant raises three assignments of error:

> **I. Did the military judge abuse her discretion when she found that the testimony of Mr. Bravo[2] was an adequate substitute for missing evidence in the form of videos that had been destroyed?**

> **II. Is the evidence legally or factually sufficient to sustain a conviction for wrongful use of a controlled substance in violation of Article 112(a), UCMJ?**

> **III. In light of *Smith v. Arizona*, did the government violate the confrontation clause when it presented testimony from a substitute expert witness who was not involved in any of the actual forensic testing, yet conveyed out-of-court statements of the other lab analysts who were?**

———

[1] 10 U.S.C. §920, 928, 912a. The members found Appellant not guilty of an additional specification of assault consummated by a battery upon a law enforcement officer.

[2] All names other than those of Appellant, the military judge, and counsel are pseudonyms.

We find merit in Appellant's first assignment of error, dismiss Charge I, and set aside the sentence.

## I. BACKGROUND

### A. Abusive Sexual Contact and Assault Consummated by a Battery

Appellant's convictions for abusive sexual contact and assault consummated by a battery stem from a night of liberty in Key West, Florida. Appellant and two friends went out drinking, ultimately visiting a strip club called "Teasers." Shortly after arriving at Teasers, Appellant agreed to pay one of the dancers, Ms. Sierra, $300 for a private dance in a private room. At some point during the private dance, Appellant touched Ms. Sierra's vulva over her underwear. Ms. Sierra immediately reacted by slapping Appellant in the face. Appellant responded by shoving Ms. Sierra with both hands, then shoving her again, pushing her onto a bench.

Teasers had an extensive surveillance system of closed-circuit cameras, including in the private dance rooms, and the entirety of Appellant's interactions with Ms. Sierra was recorded. Once Ms. Sierra left the private room after her altercation with Appellant, Mr. Bravo, the Teasers manager, called the local police, who came to Teasers and arrested Appellant. The police did not, however, secure the footage of what transpired between Appellant and Ms. Sierra. Instead, Mr. Bravo used the camera on his cell phone to film a 29-second clip of the altercation from the closed-circuit television and provided that to the police. At the start of the clip, Appellant is fully clothed and seated while Ms. Sierra, wearing only underwear, stands in front of him, facing away from him and seemingly rubbing her buttocks against his crotch. After approximately five seconds, Appellant reaches between Ms. Sierra's legs, at which point she turns around and slaps him in the face. By the time the Naval Criminal Investigative Service (NCIS) took over the investigation from the local police and attempted to retrieve the full video surveillance from the night in question, the footage had been overwritten.

In support of the Article 120 and 128 charges, the Government presented the testimony of Mr. Bravo, the arresting officer, and the NCIS agent who interviewed Appellant. The Government further presented the clip of the surveillance video that Mr. Bravo recorded on his cell phone and the audio recording of Appellant's NCIS interview, in which Appellant said that Ms. Sierra touched his genitals over his clothing before he responded by touching her. The Government did not call Ms. Sierra as a witness, honoring her preference not to testify.

### B. Motion Regarding Missing Surveillance Video

Appellant moved to dismiss the abusive sexual contact and assault consummated by a battery charges pursuant to Rule for Courts-Martial (R.C.M.)

703(e)(2) due to the unavailability of the surveillance video.[3] Appellant argued that this evidence was critical to support a reasonable mistake of fact as to consent defense to the abusive sexual contact charge, claiming that the missing video would have shown Ms. Sierra touch his crotch with her hand prior to him touching her. Appellant did not articulate how the missing evidence impacted his ability to defend against the assault consummated by a battery charge.

The military judge found that Appellant failed to demonstrate that the missing video would have shown Ms. Sierra touching his crotch before he touched her. The military judge found that the missing video would, however, have shown Ms. Sierra sitting on Appellant's lap. She determined that portion of the video was of such central importance that it was essential to a fair trial, as it "invites a defense for [Appellant] that he may have been mistaken in thinking that Ms. [Sierra] consented to [Appellant] touching her vulva."[4] The military judge then determined that Mr. Bravo's testimony was an adequate substitute for the missing video evidence, as he had viewed the video and could testify to the contents.[5] Mr. Bravo testified that prior to the incident, Ms. Sierra was sitting sideways on Appellant's lap, "like sitting on Santa's lap."[6] He said that Ms. Sierra's arms were around Appellant's shoulder, and they were speaking to each other.[7] He stated that he limited his cell phone recording to the 29-second clip of the surveillance video because "that's where the incident started."[8] He further testified that he wasn't looking for anything else in the video, either before or after the 29-second incident.[9]

Mr. Bravo described Teasers as a "full friction club" where dancers can touch customers, sit on customers' laps and rub their bodies on the customers, and customers can fondle dancers' breasts and buttocks.[10] He also testified that he watched the surveillance video in order "to find the guy that [Ms. Sierra]

---

[3] App. Ex. VIII.

[4] App. Ex. XXXIV at 10-11.

[5] App. Ex. XXXIV at 10-11; The military judge further ruled that Appellant's audio-recorded NCIS statement "may also be an adequate substitute for any missing portions of the Teasers surveillance video." She therefore ruled that if the Government did not offer the audio recording of the interview into evidence, she would allow Appellant to offer it in his case in chief. The Government ultimately introduced Appellant's interview into evidence.

[6] R. at 55.

[7] R. at 54-55.

[8] R. at 53.

[9] R. at 53-54.

[10] R. at 56, 531-32.

was describing," and that he showed his cell phone recording of the surveillance video to the police so they could identify Appellant.[11] By the time Mr. Bravo testified at trial more than 15 months after the night in question, he was unable to provide significant details about what he saw on the surveillance video, and his memory was clearly affected.[12]

**C. Cocaine Use**

Appellant's conviction for wrongful use of cocaine stemmed from a positive urinalysis test. At trial, the Government called the assistant urinalysis program coordinator to testify about the urinalysis program. The Government also called Dr. India, a senior chemist from the Navy Drug Screening Laboratory to discuss the testing process. Dr. India testified, with no objection from the Defense, that she did not conduct the testing on Appellant's urine sample, but she reviewed all documents, records, and data associated with his case and prepared the full documentation report. The Government also called a hospital corpsman from the Medical Records Department to verify that Appellant's positive test was not the result of any prescribed medication. The Government offered no evidence besides the urinalysis result to prove that Appellant knowingly used cocaine. Defense called Appellant's friend, Mr. Mike, who testified that the evening prior to Appellant's positive drug test, while Appellant was inside a casino, Mr. Mike used cocaine in Appellant's car without Appellant's knowledge. He further testified that the bag of cocaine broke, spilling the cocaine in the car. Defense also called their own drug lab expert to support the possibility that Appellant's positive drug test could be the result of Appellant innocently ingesting the spilled cocaine.

## II. DISCUSSION

**A. The entirety of the destroyed surveillance video was of such central importance that it was essential to a fair trial, and Mr. Bravo's testimony was not an adequate substitute.**

*1. Standard of Review*

We review a military judge's failure to dismiss or abate proceedings for an abuse of discretion.[13]

---

[11] R. at 524-25, 529.

[12] For example, he testified that at the time of the incident, Ms. Sierra was clothed, while in the video clip she is wearing only underwear with her top removed.

[13] *United States v. Simmermacher*, 74 M.J. 196, 199 (C.A.A.F. 2015) (citing *United States v. Ivey*, 55 M.J. 251, 256 (C.A.A.F. 2001)).

"The abuse of discretion standard calls for more than a mere difference of opinion," but instead occurs when the military judge's "findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law."[14]

*2. Analysis*

When evidence is lost or destroyed, R.C.M. 703(e)(2) sets forth the criteria and process a military judge must follow in deciding whether an accused is entitled to relief and what type of relief may be given. To be entitled to relief at trial under R.C.M. 703(e)(2), an accused must show: (1) the destroyed evidence is essential to a fair trial; (2) there is no adequate substitute for the evidence; and (3) the accused is not at fault or could not have prevented the unavailability of the evidence.[15]

If relevant and necessary evidence is of such central importance to an issue that is essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief in order to attempt to produce the evidence or shall abate the proceedings, unless the unavailability of the evidence is the fault of or could have been prevented by the requesting party.[16] Determining whether there is an adequate substitute for unavailable evidence depends upon the purpose of the evidence.[17] A military judge has broad discretion in determining whether an adequate substitute exists.[18]

In finding that only a limited portion of the missing video was of central importance, the military judge improperly failed to recognize the significance of the additional interactions between Appellant and Ms. Sierra that could have provided Appellant with evidence to support a reasonable mistake of fact defense. Mr. Bravo was unable to describe the missing video with a specific level of detail beyond stating that Ms. Sierra sat on Appellant's lap prior to the moment when he touched her. However, considering Appellant was in the private room with Ms. Sierra for what he describes as "probably, like, 10

---

[14] *United States v. Warda*, 84 M.J. 83, 90 (C.A.A.F. 2022) (quoting *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015)).

[15] *See Simmermacher*, 74 M.J. at 199.

[16] *Warda*, 84 M.J. at 91.

[17] *Id.* at 94.

[18] *Simmermacher*, 74 M.J. at 202.

minutes"[19] before he touched her, there is no doubt that their interactions were more involved than Mr. Bravo described them to be. Those interactions, in an inherently sexualized context that apparently involved a tacit agreement between the parties permitting a variety of intimate conduct, are critical in determining whether he had a reasonable mistaken belief that she consented to him touching her. Mr. Bravo's limited testimony could not adequately convey the quality of those interactions.

According to Mr. Bravo, he reviewed the surveillance video primarily to identify the customer who had assaulted Ms. Sierra. He chose to start the cell phone recording when he did because "that's where the incident started."[20] He further stated that he was not looking for anything else in the video.[21] It is unreasonable to conclude that Mr. Bravo's brief review of the video in order to identify the suspect allowed him to present the members with the crucial facts of whether Ms. Sierra's actions would indicate to a reasonable person that she consented to Appellant touching her. Through Mr. Bravo's testimony, the members had no understanding of Appellant's and Ms. Sierra's interactions prior to entering the private room or immediately upon entering the private room. The members further had no understanding of Appellant's and Ms. Sierra's interactions that led to her sitting on his lap, and their interactions between the time she got off his lap and he eventually touched her, which at a minimum included her removing her top and some amount of a "full friction" dance. Mr. Bravo's superficial testimony was therefore not an adequate substitute for the missing video.

The military judge found that Appellant failed to demonstrate that "the missing portion of the video would show Ms. [Sierra] touching [Appellant's] groin area."[22] She based this finding largely on the fact that "the only evidence . . . that Ms. [Sierra] may have touched the crotch of [Appellant] comes from [Appellant's] . . . statement to NCIS," and Mr. Bravo testified that he never saw Ms. Sierra touch Appellant's crotch.[23] According to the military judge, Appellant's version of events was not believable because he told NCIS that Ms. Sierra touching his crotch and him touching her happened "very quickly," but

---

[19] App. Ex. XLVII at 27.

[20] R. at 53.

[21] R. at 53, 54.

[22] App. Ex. XXXIV at 10.

[23] App. Ex. XXXIV at 10.

the 29-second video clip shows him sitting for approximately five seconds before he touches her, and does not capture her touching him.[24] However, the military judge disregarded the possibility that Ms. Sierra touched Appellant's groin earlier in their interactions than as described by Appellant to NCIS. This possibility is particularly realistic considering Appellant's interview with NCIS occurred more than four months after the night in question. Furthermore, Appellant told NCIS that, although he was certain that Ms. Sierra touched him before he touched her, "it was hard for me to remember everything that happened that night."[25]

The military judge also erred by failing to consider the fact that Mr. Bravo's credibility in describing what occurred in the surveillance video was damaged by the testimony of two separate defense witnesses. First was a defense investigator who testified in support of the Defense motion on this issue. He testified that he visited Teasers when investigating Appellant's case, and while he sat at the bar, a dancer approached him to offer a private dance and touched his penis and testicles.[26] This testimony was later bolstered by the testimony of Mr. West, who accompanied Appellant to Teasers on the night in question and testified for the Defense at trial on the merits. He described the dancers encouraging him to come into the club by grabbing his butt and his "groin area" while he and Appellant were still out on the street,[27] and further described his own private dance as "full-contact. Like a butt on your lap and groping the groin area."[28] While neither of these witnesses had any personal knowledge of whether Ms. Sierra touched Appellant, their testimony demonstrated a pattern of behavior by Teasers dancers that was inconsistent with Mr. Bravo's testimony that dancers are "absolutely not" allowed to touch customers' crotches,[29] and his unequivocal statement that dancers "follow the rules."[30] The defense investigator and Mr. West's testimony, therefore, provided circumstantial corroboration of Appellant's version of events and damaged Mr. Bravo's credibility, thereby calling into question his ability to serve as an adequate substitute for the missing evidence.

---

[24] App. Ex. XXXIV at 10.

[25] App. Ex. XLVII at 60.

[26] R. at 64.

[27] R. at 778-79.

[28] R. at 780.

[29] R. at 522.

[30] R. at 56.

Furthermore, despite the fact that Teasers had an extensive surveillance system that recorded the entirety of Appellant's and Ms. Sierra's interactions in the club, Mr. Bravo never reviewed any video from outside of the private room. In his NCIS statement, which the Government played for the members, Appellant described Ms. Sierra as approaching him at the bar and offering him a private dance for $1,000. He said "no, I'm not paying that," and she kept "trying to pull me back in . . . with different prices."[31] After agreeing on a price of $300, Appellant went to the ATM, "and [Ms. Sierra is] with me, like, the whole time . . . and then we go upstairs. And then, she goes to the bar, gets me a drink, and then hands it to me. And then we go to the—we go into the private room."[32] In order to determine whether Appellant had a reasonable mistaken belief that Ms. Sierra consented to his actions, it was essential for the members to get a full understanding of the entirety of Appellant's interactions with Ms. Sierra immediately prior to the charged abusive sexual contact. Ms. Sierra did not testify at the court-martial, and no one, including Mr. Bravo and all of the law enforcement officers investigating the case, ever viewed this critical evidence. The importance of this destroyed evidence was further demonstrated by the testimony of the defense investigator and Mr. West, who described the aggressive actions of the Teasers dancers towards customers outside of the private rooms, directly contradicting Mr. Bravo's testimony about dancers not touching customers' crotches. Therefore, even if Mr. Bravo's testimony was an adequate substitute for the destroyed video of the private room, under the specific facts of this case, his testimony was not an adequate substitute for the centrally important portions of the surveillance video that he never viewed.

While no binding precedent provides this Court with an analogous set of circumstances to the facts of Appellant's case, *United States v. Seton*, a case from the Air Force Court of Criminal Appeals (AFCCA) involving a government appeal, presents similar facts and is extremely persuasive (and was subsequently affirmed by the Court of Appeals for the Armed Forces in a decision without published opinion).[33] In *Seton*, AFCCA affirmed the decision of the military judge to dismiss a sexual assault charge due to law enforcement's failure to secure surveillance video of the appellee and the victim both before and after an alleged sexual assault.[34] The government argued that a "dormitory leader" in the building where the alleged sexual assault occurred who viewed

---

[31] App. Ex. XLVII at 51.

[32] App. Ex. XLVII at 53.

[33] No. 2013-27, 2014 CCA LEXIS 103 (A.F. Ct. Crim. App. Feb. 24, 2014) (unpublished), *aff'd,* 73 M.J. 347 (C.A.A.F. 2014) (mem.).

[34] *Id.*

the video was an adequate substitute because he could testify to what he observed.[35] AFCCA disagreed, finding that the military judge was correct in stating that:

> The dynamics of a mutual interaction occurring almost immediately before and after a reported sexual assault cannot be adequately conveyed by a witness' summary description. The old adage, 'A picture is worth a thousand words,' comes to mind at this point. Simply put, [the dormitory leader's] testimony is not an adequate substitute for the video.[36]

AFCCA upheld the military judge's decision, specifically noting it was reasonable because more than a year had passed since the dormitory leader saw the video, he only viewed the video once and had fast-forwarded through large portions of the video, and he admitted he did not remember all the details.[37] AFFCA said that "[t]he testimony of one person who is not a trained investigator, who was not necessarily looking for exculpatory evidence, and who did not remember many details of the video is simply not an adequate substitute for the video itself[,]" as there was "no way [his] testimony could adequately replicate for the factfinder the subtle nuances of the participants' behavior and reactions."[38]

We find the facts of Appellant's case to be particularly analogous to those in *Seton*, and we apply the same reasoning as the AFCCA in arriving at our decision. When Mr. Bravo testified, more than 15 months had passed since he viewed the video. When he watched the surveillance video, he focused only on the time from when Appellant touched Ms. Sierra's vulva until he left the room, and he was not looking for anything in their previous interactions. He was not a trained investigator, was not looking for any exculpatory evidence, and did not remember all of the details of the video. For all of these reasons, there was no way his testimony could adequately replicate for the members the subtle nuances of the participants' behavior and reactions, which would have been critical in determining whether Appellant had a reasonable mistaken belief that Ms. Sierra consented to his touching her. Like in *Seton*, the dynamics of a mutual interaction occurring almost immediately before a reported abusive sexual contact could not be adequately conveyed by the witness's summary description.

---

[35] *Id.* at *16.

[36] *Id.*

[37] *Id.* at *16-17.

[38] *Id.* at *17-18.

The facts regarding the missing evidence in Appellant's case are distinguishable from those in our opinion in *United States v. Jones*.[39] There, we found that the military judge did not abuse his discretion in denying appellant's motion to dismiss or abate the case despite the loss of two text messages a sexual assault victim sent to a friend after the alleged assault.[40] Although we determined that the messages were relevant and necessary to show that the sexual activity in question may have been consensual, we found that the law enforcement video of the victim's interview, which included her reading the text messages to investigators, provided the appellant sufficient understanding of the contents of the messages and the necessary information to use them to impeach the alleged victim.[41]

Unlike *Jones*, where the original messages themselves provided no additional context to the content of the messages read aloud during the law enforcement interview, the context of the missing evidence in Appellant's case could not be adequately conveyed through Mr. Bravo's testimony. While the contents of a text message can be communicated precisely when read aloud, video evidence is not so easily described. Additionally, the recorded reading of a text message is not subject to degradation due to fading memory, as were the details of the surveillance video in Appellant's case.

Because of the unique facts presented in this case, we are convinced that the entirety of the lost surveillance video was of such central importance that it was essential to a fair trial. We therefore conclude that the military judge's narrow determination that *only* the limited portion of the missing evidence where Ms. Sierra sat on Appellant's lap was of central importance was outside the range of choices reasonably arising from the applicable facts and the law. We further conclude that the military judge's determination that Mr. Bravo's testimony was an adequate substitute for the missing evidence was outside the range of choices reasonably arising from the applicable facts and the law. Mr. Bravo reviewed the surveillance video for the primary purpose of identifying the customer who assaulted Ms. Sierra. He did not recall the details of the video with specificity, and his credibility was significantly diminished by the testimony of the defense investigator and Mr. West. The military judge's determination that he was an adequate substitute for the missing evidence was therefore an abuse of discretion.

---

[39] 2018 CCA LEXIS 60 (N-M. Ct. Crim. App. Feb. 18, 2018) (unpublished).

[40] *Id.*

[41] *Id.*

"If a continuance or other relief cannot produce the missing evidence, the remaining remedy for a violation of R.C.M. 703(e)(2) is abatement of the proceedings."[42] We therefore hold that, due to the particular facts presented in this case, the military judge's decision was outside the range of choices reasonably arising from the applicable facts and the law, and she abused her discretion when she failed to abate the proceedings with regards to the abusive sexual contact charge.

Appellant argues that his conviction for assault consummated by a battery upon Ms. Sierra should also be set aside due to the lost video evidence. We disagree. Appellant has entirely failed to explain, and this Court can conceive of no circumstance, how evidence of Appellant's earlier interactions with Ms. Sierra could provide evidence of such central importance that it was essential to a fair trial on the assault consummated by a battery charge. At trial, the Defense argued that Appellant acted in self-defense when he shoved Ms. Sierra after she slapped him. All the evidence required to determine whether Appellant might have lawfully acted in self-defense was contained within the 29-second clip that the members viewed at trial. When seeking relief because evidence was destroyed, the burden is on the defense to show that the evidence is of such central importance to an issue that it is essential to a fair trial.[43] Here, Appellant has failed to demonstrate that anything on the destroyed video would have even been relevant to the assault consummated by a battery charge, let alone how it was of such central importance that it was essential to a fair trial.

## B. The evidence supporting the wrongful use of cocaine was legally sufficient.

### 1. Standard of Review

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt."[44] The standard for legal sufficiency therefore involves a very low threshold to sustain a conviction.[45]

### 2. Analysis

---

[42] *Simmermacher*, 74 M.J. at 201.

[43] *Warda*, 84 M.J. at 92.

[44] *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).

[45] *United States v. Smith*, 83 M.J. 350, 359 (C.A.A.F. 2023).

In order to prove Appellant guilty of the sole specification under Charge III, the Government had to prove beyond a reasonable doubt that on or about April 2023: (1) Appellant used cocaine; and (2) Appellant's use was wrongful.[46] The Manual for Courts-Martial explains that to be wrongful, the use must be without legal justification or authorization.[47] More specifically, possession or use "without knowledge of the contraband nature of the substance" is not wrongful.[48] At trial, the Government presented uncontradicted evidence that Appellant's urine contained the metabolite for cocaine and relied on the permissive inference to show that this resulted from wrongful use. Appellant presented a theory for how he could have unknowingly ingested cocaine, which the members considered and rejected. Considering the evidence presented at trial in the light most favorable to the prosecution, a reasonable factfinder could have found both elements beyond a reasonable doubt. The evidence is therefore legally sufficient.

## C. The evidence supporting the wrongful use of cocaine was factually sufficient.

### 1. Standard of Review

This Court may consider whether a finding of guilty is correct in fact upon request of an appellant who makes a specific showing of a deficiency in proof.[49] If an appellant makes such a showing, this Court may weigh the evidence and determine controverted questions of fact, providing appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence. If we are clearly convinced that the finding of guilty was against the weight of the evidence, we may dismiss, set aside, or modify the finding, or affirm a lesser finding.[50]

### 2. Analysis

Appellant argues that his conviction for wrongful use of a controlled substance is factually insufficient because the permissive inference as to wrongfulness does not overcome the evidence that Appellant's passive ingestion of the drug was unknowing and therefore not wrongful.[51]

---

[46] Article 112a, UCMJ.

[47] Part IV, para. 50.c.5.

[48] *Id.*

[49] Article 66(d)(1)(B), UCMJ, 10 U.S.C. § 866(d)(1)(B).

[50] *Id.*

[51] Appellant's Brief at 21.

We must first consider whether Appellant has made a specific showing of a deficiency in proof.[52] Here, we assume without deciding that the evidence suggesting that Appellant unknowingly ingested cocaine that Mr. Mike spilled in his car amounted to a sufficient weakness in the evidence to initiate our factual sufficiency review. However, we find the evidence factually sufficient to sustain Appellant's conviction for wrongful use of a controlled substance.

Appellant correctly points out that the Manual for Courts-Martial provides that use of a controlled substance may be inferred to be wrongful in the absence of evidence to the contrary.[53] Mr. Mike and the defense expert presented evidence to the contrary by raising an innocent ingestion defense in this case. Appellant's argument that this contrary evidence prohibits application of the permissive inference of wrongful use, however, is ultimately foreclosed by *United States v. Ford*.[54] In *Ford*, our superior court determined that the permissive inference may be drawn *even despite contrary evidence*, where the defense-presented contrary evidence could reasonably be disbelieved by the factfinder.[55] We afford a high level of deference to the fact that the members saw and heard the witnesses and were able to assess their credibility. The members in Appellant's case clearly (and reasonably) disbelieved Mr. Mike's far-fetched version of events that he spilled a bag of cocaine in Appellant's car without Appellant's knowledge. This Court is similarly unmoved by this evidence, and we decline to conclude that Appellant ingested a sufficient amount of the purported spilled cocaine to cause a positive urinalysis. Instead, we apply the permissive inference of knowing use, just as the members did, and we are not clearly convinced that the finding of guilty was against the weight of the evidence.

---

[52] Article 66(d)(1)(B), UCMJ.

[53] Appellant's Brief at 21; *MCM*, Part IV, para. 50.c.5.

[54] 23 M.J. 331, 334 (C.M.A. 1987).

[55] *Id.*

**D. The Government's drug lab expert's testimony did not violate the confrontation clause.**

*1. Standard of Review*

This Court reviews forfeited issues under a plain error standard.[56] Plain error is an error that is clear or obvious and results in material prejudice to a substantial right.[57]

*2. Analysis*

"An appellant gets the benefit of a change to the law that occurs between his trial and the time of his appeal."[58] This court-martial adjourned in March 2024, and in June 2024, the Supreme Court of the United States decided *Smith v. Arizona*.[59] In *Smith*, the Supreme Court held that "[a] state may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her."[60] The Supreme Court also held that the state may not:

> introduce those statements through a surrogate analyst who did not participate in their creation. And nothing changes if the surrogate . . . presents the out-of-court statements as the basis for his expert opinion. Those statements, as we have explained, come into evidence for their truth–because only if true can they provide a reason to credit the substitute expert. So a defendant has the right to cross-examine the person who made them.[61]

This Court issued a published opinion on the precise issue raised by Appellant in *United States v. Dillenburger* in March 2025.[62] In fact, Appellant submitted precisely the same assignment of error in this case as the appellant submitted to this Court in *Dillenburger*, and Appellant's brief presents the same arguments as the appellant in *Dillenburger*. That is quite understandable, as Appellant submitted his brief before this Court decided *Dillenburger*.

---

[56] *United States v. Harcrow*, 66 M.J. 154, 156 (C.A.A.F. 2008).

[57] *See United States v. McPherson*, 81 M.J. 372, 377 (C.A.A.F. 2021).

[58] *Unites States v. Tovarchaves*, 78 M.J. 458, 462 (C.A.A.F. 2019) (citing *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987)); *United States v. Mullins*, 69 M.J. 113, 116-17 (C.A.A.F. 2010).

[59] 602 U.S. 779 (2024).

[60] *Id.* at 802-03.

[61] *Id.* (citation omitted).

[62] 85 M.J. 599 (N-M. Ct. Crim. App. 2025), *rev. denied*, __M.J. __, No. 25-0174/NA, 2025 CAAF LEXIS 561 (C.A.A.F. Jul. 17, 2025).

However, in light of this Court's binding precedent, we will not unnecessarily belabor the point by reissuing the decision here. *Dillenburger* was factually distinguishable from *Smith*. Appellant's case is factually distinguishable from *Smith* in the same manner as *Dillenburger*. Therefore, for the same reasoning expressed in *Dillenburger*, we find that Appellant failed to establish under a plain error standard that Dr. India's testimony impermissibly conveyed testimonial hearsay and violated the Confrontation Clause.

## III. CONCLUSION

After careful consideration of the record and the briefs of appellate counsel, we hold that the military judge abused her discretion by finding that Mr. Bravo's testimony was an adequate substitute for the missing surveillance video which was of such central importance that it was essential to a fair trial. Charge I is **DISMISSED**. The remaining findings of guilt are **AFFIRMED**. The sentence is **SET ASIDE**. Because dismissal of Charge I results in a dramatic change to the penalty landscape and the remaining offenses do not capture the gravamen of criminal conduct included within the original offenses,[63] we decline to reassess the sentence. The record is returned to the Judge Advocate General. A rehearing on Charge I and the sentence is authorized.[64]



FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[63] *See United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013).

[64] Articles 59 & 66, UCMJ, 10 U.S.C. §§ 859, 866.